IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2005

## STATE OF TENNESSEE v. NAKOMIS JONES

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 02-02917, -02918, -04286    Joseph B. Dailey, Judge**

---

**No. W2004-01583-CCA-R3-CD  - Filed October 5, 2005**

---

A Shelby County Criminal Court jury convicted the appellant, Nakomis Jones, of two counts of first degree felony murder, one count of second degree murder, two counts of especially aggravated kidnapping, and three counts of being a felon in possession of a weapon.  The trial court merged the murder convictions, merged the especially aggravated kidnapping convictions, and merged the convictions for being a felon in the possession of a weapon and sentenced the appellant to consecutive sentences of life, thirty-five years, and three years, respectively.  In this appeal, the appellant claims (1) that the evidence is insufficient to support the convictions, (2) that the trial court erred by refusing to allow him to impeach a victim to show bias; (3) that the trial court erred by refusing to allow him to impeach a victim with prior bad acts; and (4) that the trial court erred by ordering consecutive sentencing.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Joshua Spickler and Autumn Chastain, Memphis, Tennessee, for the appellant, Nakomis Jones.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; William L. Gibbons, District Attorney General; and Robert Carter and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

Kevin Wiseman testified that he and Jesse Windom were brothers and sold used cars together at Just for You Auto Sales in Memphis.  On August 7, 2001, Windom had been working at the car lot, which closed at 5:00 p.m.  About 6:00 p.m., Windom telephoned Wiseman and asked him to

come to the lot in order for Windom to get a set of keys from Wiseman. Wiseman went to the lot and met Windom, who was driving a black Lexus. A white Dodge Stratus with three African-American men inside pulled into the lot, and the driver of the Stratus got out and began talking to Windom. Wiseman related that the man appeared to know Windom but that Wiseman did not know any of the men in the Stratus. A second man got out of the Stratus and approached Wiseman, and Wiseman saw that the man had a gun. The third man remained in the Stratus but pointed a sawed-off shotgun out of the car and told Wiseman that he would shoot if Wiseman tried to run. The first man, who had been talking to Windom, pulled up his shirt and showed that he had a gun in his pants. Wiseman identified codefendant Norris Ray as the first man and the appellant as the second man. Wiseman related that the third man, who remained in the Stratus, was never identified.

Ray got into Windom's Lexus and started the engine. The appellant then ordered Wiseman to get into the Lexus' trunk. The car started moving, and Wiseman heard a man tell Windom, "[T]ell me where the money is or I'm going to kill you." Wiseman then heard Windom say, "I don't have any money, the police done took it all." After five or ten minutes, Wiseman heard a gunshot and heard Windom yell. He then heard a car door close and heard a man say, "[T]here go the police. You know they're coming." Wiseman recalled that the car began making a lot of turns and that he was sliding around in the trunk. He then heard the car engine cut off and heard the car doors close. Wiseman waited ten or fifteen minutes and began pounding on the trunk. As he was wiping sweat off his face, he hit the inside trunk latch and the trunk popped open. Wiseman said that the men were gone and that he was in the Southwood apartment complex, which is next to the Flairwood apartment complex. He got out of the trunk and saw a friend, who agreed to drive him back to the used car lot. As they were driving, they saw an ambulance at a Mapco convenience store. They stopped at the store and learned that Windom had been shot and was in the ambulance. Windom later died. Wiseman testified that he went to the police department, looked at a photographic array, and identified Norris Ray as the driver of the Stratus. Two days later, he looked at another photographic array and picked out the appellant's photograph. Wiseman testified that he was certain Ray and the appellant were the men who pulled guns on him and his brother. He acknowledged having prior misdemeanor theft convictions.

On cross-examination, Wiseman acknowledged that he initially told police he could only identify the driver of the Stratus. However, two days later he picked out the appellant's photograph and identified him as the second man who ordered him into the trunk. Wiseman also acknowledged that in his initial description of the second man, he stated that the man had a "medium fade" haircut. He acknowledged that in the appellant's photograph, the appellant had braided hair. He said that he recognized the appellant by his face and that the appellant did not have braided hair at the time of the robbery. He acknowledged that while the appellant was pointing the gun at him, he was not focusing on the appellant's face. He also acknowledged that he never saw who actually got into the Lexus with his brother.

Officer Gary Claxton of the Memphis Police Department testified that on August 7, 2001, at about 6:30 p.m., he was off duty and driving his Nissan Maxima westbound on Winchester Road. He noticed a black Lexus in the lane to turn south onto Tchulahoma Street. Suddenly, a white Dodge

Stratus pulled out and nearly hit him. Claxton stated that he swerved to avoid hitting the Stratus and pulled into the turn lane behind the Lexus. He related that all three cars were in the turn lane waiting to turn left onto Tchulahoma and that the Lexus was in front, that his Maxima was behind the Lexus, and that the Stratus was behind the Maxima. While the cars were waiting to turn left, a man jumped out of the backseat of the Lexus and ran into a nearby Mapco parking lot. Claxton stated that the man appeared to be having a panic attack and fell down. The Lexus made a u-turn and drove into the Mapco lot. When the traffic light turned green, Claxton pulled over to let the Stratus pass him. He then wrote down the Stratus' license plate number. The Lexus drove out of the Mapco parking lot and traveled south on Tchulahoma. Claxton began following the Lexus and called a dispatcher to give her the Stratus' license plate number and tell her that "something strange" was going on in the area. Claxton stated that he followed the Lexus for three or four minutes but lost sight of it. He then returned to the Mapco parking lot.

Chandra Jones, Norris Ray's ex-fiancé, testified that she owned a 1998 Dodge Stratus. About 5:00 p.m. on August 7, 2001, she loaned the car to Ray and Ray returned the car later that night. About midnight, the police called Jones' apartment and asked her to come outside. Jones met the police outside and told them that Ray was asleep in her apartment. The police asked her to telephone Ray and ask him to come outside, and she did so. On cross-examination, Jones testified that she did not know the appellant and had never seen him before. She stated that about 6:45 p.m. on August 7, she called her cellular telephone, which was in her car, and a man named Geno answered.

Kim Hughes testified that in August 2001, she lived in the Flairwood apartment complex. On the evening of August 7, the appellant came to her door, told her that his car had broken down on Tchulahoma Street, and asked to use her telephone. Hughes did not know the appellant but handed him her cordless telephone. The appellant appeared nervous and tried dialing a couple of telephone numbers but never completed the calls. While he was using the telephone, Norris Ray walked up to the appellant, and the appellant handed him the telephone. Ray made a telephone call and said, "Geno, come get us." Ray also told Geno that he was at the Flairwood apartment complex. The next day, Hughes saw information on the news about Jesse Windom's shooting and called Crime Stoppers. As a result of her call, a police officer came to her apartment and showed her photographic arrays. Hughes picked out Ray's and the appellant's photographs. She said that the appellant had braided hair when he came to her apartment. On cross-examination, Hughes testified that Crime Stoppers paid her money for her information.

Lieutenant Prentiss Jolly of the Memphis Police Department testified that about 7:35 p.m. on August 7, 2001, he responded to a call at the Mapco convenience store at the intersection of Winchester and Tchulahoma. When he arrived, Jesse Windom had already been transported to the hospital. About 8:15 p.m., Jolly learned that Windom had died. Jolly investigated the case and interviewed Kevin Wiseman and Officer Gary Claxton. As a result of the investigation, the police began looking for a white Dodge Stratus and a black Lexus. Jolly also checked the license plate number that Claxton had provided and learned that the car was registered to Nanny Harris and Chandra Jones. Jolly learned Ms. Jones' address and went to her apartment complex, where he saw a white Dodge Stratus. Jolly telephoned Ms. Jones and asked her to come outside. Ms. Jones came

out of the apartment and told Jolly that Norris Ray was her boyfriend and that he was asleep inside the apartment. Ms. Jones then called Ray and asked him to come outside. Ray came out of the apartment, and the police arrested him.

Sergeant Joe Stark of the Memphis Police Department testified that on August 8, 2001, he helped process a white Dodge Stratus and a black Lexus. Stark obtained a fingerprint from the Lexus' outside rear passenger door window. The print was in a downward position, meaning that the person who left the print was either on top of the car or had his hand on the window while the door was open.

Investigator Don Carpenter of the Memphis Police Department testified that he also dusted the Stratus for fingerprints. He recovered a fingerprint from the driver's side window of the Stratus. The print was in a downward position. He also recovered a palm print from the Stratus' outside rear door panel. On cross-examination, Carpenter testified that it was impossible to know how long the prints had been on the car.

Latent Print Examiner Martin Milner of the Memphis Police Department testified that he received the prints that Stark and Carpenter recovered. He submitted the prints to the Automated Fingerprint Identification System (AFIS), a fingerprint database. AFIS gave Milner the names of twenty-five possible matches for the prints. Milner then compared the recovered prints with prints that were on file for those individuals. He concluded that the palm print recovered from the rear door panel of the Stratus matched the appellant and that the fingerprint recovered from the Stratus' driver's side window matched Norris Ray. Two fingerprints recovered from the Lexus matched Jesse Windom.

Tom Deering, the Interim Medical Examiner for Shelby County, testified that O.C. Smith performed Windom's autopsy. According to Dr. Smith's autopsy report, the victim was shot once in the abdomen. The bullet entered Windom's right flank area and exited his left hip. The bullet cut through Windom's right common iliac artery and right common illiac vein, causing extensive bleeding and death. The victim's blood tested negative for alcohol and drugs.

Kimbery Tanzy testified that she worked for the Shelby County Criminal Court Clerk's Office. The appellant was convicted of three felony drug offenses in 1996.

Norris Ray testified on his own behalf that about 4:15 p.m. on August 7, he drove Chandra Jones' Dodge Stratus to Geno's apartment. Ray stayed at Geno's apartment for about thirty minutes. Ray's brother, Marvin Jackson, came to Geno's apartment and Ray and Jackson left and went to Jackson's apartment in Frayser. Ray left the Stratus and its keys at Geno's house. About 5:15 p.m., Daphne Love came to Jackson's apartment and Love and Ray drove to Dyersburg. There, they smoked marijuana, had sex, and visited Ray's other brother, Anthony Jackson. Love drove Ray back to Geno's apartment in Memphis about 10:00 p.m. Ray got the Stratus' keys from Geno's girlfriend, drove the Stratus to Chandra Jones' apartment, and went to sleep. At some point, the police called Ms. Jones' apartment and Ray answered the telephone. The police asked to speak with Ms. Jones

and told Ray that Ms. Jones' car had been involved in a hit-and-run accident. Ray thought the call was a joke and hung up. The police called back repeatedly, and Ray hung up each time. Finally, he gave the telephone to Ms. Jones and Jones went outside to speak with the police. The police then called Ray and asked him to come outside. Ray left the apartment, and the police arrested him. Ray related that he had seen the appellant previously but did not know him. He also stated that he did not know Kim Hughes and had never seen her before.

On cross-examination, Ray acknowledged having prior convictions for sexual battery and burglary. He stated that he knew Jesse Windom but that they did not "hang out" together. Ray stated that he was not disputing that Ms. Jones' white Stratus was used during Windom's killing. However, he stated that Geno and two other men must have used Ms. Jones' car and kidnapped Windom and Wiseman.

The appellant was charged with two counts of first degree felony murder, one count of first degree premeditated murder, two counts of especially aggravated kidnapping against Kevin Wiseman, and three counts of being a felon in possession of a handgun. The jury convicted him of one count of felony murder during the perpetration of especially aggravated kidnapping, one count of felony murder during the perpetration of especially aggravated robbery, and the lesser included offense of second degree murder. The jury also convicted the appellant of two counts of especially aggravated kidnapping, a Class A felony, and three counts of being a felon in possession of a weapon, a Class E felony. The trial court merged the murder convictions, merged the especially aggravated kidnapping convictions, and merged the possession of a weapon convictions. The trial court sentenced the appellant as a Range II offender to consecutive sentences of life for the murder conviction, thirty-five years for the especially aggravated kidnapping conviction, and three years for the possession of a weapon conviction.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support his convictions because there were no eyewitnesses to the crimes and no evidence to prove that the appellant was present when the crimes were committed. In addition, he argues that the evidence is insufficient because Kevin Wiseman initially told police that the man who forced him into the trunk had a medium fade haircut but later picked out the appellant's photograph, which showed that the appellant had braided hair. The appellant also argues that Kim Hughes' testimony only proves that the appellant was with Norris Ray on the evening of the crimes. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P.

13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

When viewed in the light most favorable to the State, the evidence reveals that about 6:00 p.m. on August 7, three men in a Dodge Stratus pulled into the used car lot. Norris Ray, who had been driving the Stratus, got out of the car and began talking to Jesse Windom. A second man got out of the Stratus, approached Kevin Wiseman, and pulled a gun. Although Wiseman told the police and testified at trial that the second man had a medium fade haircut, he later identified the appellant, who had braids, as the second man. Wiseman saw Ray start Windom's Lexus, and the appellant forced Wiseman into the car's trunk. The car started moving, and Wiseman heard someone questioning his brother. He then heard a gunshot, heard his brother yell, and heard a car door close. Gary Claxton testified that Windom got out of the Lexus, ran into a Mapco parking lot, and collapsed.

When the Lexus stopped, Wiseman heard the car doors open and close. Wiseman was able to get out of the trunk, saw that no one was around, and realized that he was in the Southwood apartment complex, which is next to the Flairwood complex. Kim Hughes testified that about 6:45 p.m., she was in her Flairwood apartment when the appellant approached and asked to use her telephone. Hughes related that the appellant appeared nervous and tried to make a telephone call but could not complete the call. Shortly threafter, Norris Ray arrived, called Geno, and asked Geno to come to the apartment complex to pick them up. The police later found Ray and the white Dodge Stratus at Chandra Jones' apartment, and a fingerprint expert determined that the appellant's palm print was on the Stratus. Although no one saw the appellant get into the Lexus with Windom or shoot Windom, the jury obviously accredited the testimony of the State's witnesses. The evidence was sufficient for a jury to conclude beyond a reasonable doubt that the appellant committed the crimes.

## B. Impeachment for Bias

Next, the appellant claims that the trial court erred by refusing to allow him to question Kevin Wiseman about a felony theft charge and two felony drug charges that were pending against him at the time of the crimes in question. Before the trial in the instant case, Wiseman pled guilty to misdemeanors, and the appellant contends that he should have been allowed to question Wiseman about the reduced charges in order to show that Wiseman was biased in favor of the State. The State claims that the trial court did not err by refusing to allow the appellant to question Wiseman about the potential bias. We conclude that the trial court erred but that the error was harmless.

The record reflects that after Wiseman testified for the State, the jury left the courtroom and the appellant requested that he be allowed to question Wiseman about "some settlements of some cases that Mr. Wiseman has had since this incident happened." The appellant told the trial court that Wiseman had been charged with one felony theft and at least two felony drug offenses but had plead guilty before the trial in the instant case to misdemeanors. The State responded that it did not know which prosecutor handled the appellant's misdemeanor convictions and that to its knowledge, the appellant's pleading guilty to the misdemeanors was unrelated to the present case. The trial court ruled that there was nothing to suggest that the appellant received favorable treatment in return for his testimony. It also noted that the felony drug offenses were not violent offenses and that reducing felony drug offenses to misdemeanors is "done everyday for reasons related to evidence and proof or lack thereof." The trial court ruled that the appellant could not question Wiseman about the reduced charges but could ask Wiseman in front of the jury if Wiseman had been promised anything in exchange for his testimony. Before the jury returned to the courtroom, the appellant asked Wiseman if he had been promised anything in return for his testimony, and the appellant replied, "No."

Tennessee Rule of Evidence 616 provides that a party "may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." As noted by the Advisory Commission Comment, "[b]ias is an important ground for impeachment." "The right to explore or examine witnesses for bias is a fundamental right." State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). Furthermore, "[a]n undue restriction of this right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article I, Section 9, of the Tennessee Constitution." Id. We will uphold the trial court's decision absent an abuse of discretion. Id.

The appellant argued to the trial court and argues in his brief to this court that Sayles is persuasive. In Sayles, the defendant was charged with second degree murder. Id. at 277. Before the State called its first witness to testify, one of the State's witnesses told the trial court that he would not testify because the defendant had threatened him and had warned him not to testify. Id. The trial court allowed one of the prosecutors to talk with the witness privately. Id. When they returned to the courtroom, the prosecutor announced that the witness would testify. Id. At the end of the witness' testimony, the State asked him if the State had promised him anything in return for his testimony and the witness said no. Id. at 278. In a jury out hearing after the witness' testimony, the State asked that the witness' bond in an unrelated case be reduced to one thousand dollars and that a charge against him for aggravated robbery be reduced to robbery. Id. The trial court agreed, and the defendant asked to question the witness regarding this apparent deal with the State. Id. However, the trial court refused to allow the defense to question the witness further and refused to allow the defense to make an offer of proof. Id. Our supreme court held that "the trial court's failure to allow such an examination was error." Id. at 280. The court also stated that the defendant's "right to a fair trial entitled him to probe witnesses under oath. The trial court, therefore, erred in refusing to allow Sayles's counsel to delve deeper into the reasons for [the witness'] turnaround." Id.

Initially, we note that unlike Sayles, in which an apparent deal had been struck between the witness and the State, there is no indication that the State had promised Wiseman anything in return for his testimony. Nevertheless, we agree with the appellant that the defense should have been allowed to question Wiseman about whether there was a connection between his allegedly reduced charges and his testimony because such a connection could infer to the jury that Wiseman was biased in favor of the State.

Nevertheless, we hold that such error was harmless. In order to determine whether the constitutionally improper denial of a defendant's opportunity to impeach a witness is harmless,

> "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

Id. (quoting Deleware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986)). In the instant case, Wiseman identified the appellant and Ray as the men who pulled up in the white Stratus about 6:00 p.m. and kidnapped him and his brother. The appellant's palmprint was recovered from the Stratus. Wiseman saw Ray start Windom's Lexus, and the appellant forced Wiseman into the trunk. After the car started moving, Wiseman heard a man demand money from Windom, heard a gunshot, and heard the Lexus' door close. He also testified that the Lexus began making many turns and that he was sliding around in the trunk. Gary Claxton saw the Lexus and the Stratus driving erratically and saw Windom get out of the Lexus and collapse in the Mapco parking lot, corroborating some of Windom's testimony. Shortly after Claxton witnessed these events, the appellant and Ray arrived at Kim Hughes' apartment. She testified that the appellant acted nervous, that he asked to use her telephone, that Ray made a telephone call, and that Ray said, "Geno, come get us." Chandra Jones loaned her Dodge Stratus to Ray on the evening of the crimes, and when she called her cellular telephone, which was in the car, a man named Geno answered. Based upon the entire record in this case, we conclude that the error was harmless beyond a reasonable doubt.

### C. Impeachment with Prior Bad Acts

The appellant also claims that the trial court erred by refusing to allow him to impeach Kevin Wiseman with prior bad acts pursuant to Tennessee Rule of Evidence 608. During a jury out hearing, the appellant asked that he be allowed to question Wiseman about allegations that he and Windom had knowingly sold carjacked cars from their used car lot. The appellant told the trial court

that as a result of the allegations, Wiseman had been indicted for theft of property valued over ten thousand dollars and had pled guilty to misdemeanor theft. The appellant argued that he should be allowed to question Wiseman about the allegations because they were relevant "to his believability, credibility, and trustworthiness." The trial court ruled that because the allegations had resulted in Wiseman's pleading guilty to the lesser offense of misdemeanor theft, the appellant could ask Wiseman about the theft conviction. However, the trial court ruled that the appellant could not ask Wiseman about the specific facts underlying the conviction. The appellant claims that the trial court erred because the underlying facts of the misdemeanor theft conviction were probative to Wiseman's truthfulness.

Tennessee Rule of Evidence 608(b) provides,

> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . ., be inquired into on cross-examination.

Rule 609 provides that if certain procedures are satisfied, the credibility of an accused may be attacked by evidence of prior convictions if the prior convictions were punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or involved dishonesty or false statement. Tenn. R. Evid. 609(a)(2). A trial court's ruling under Rule 609 will not be reversed on appeal absent an abuse of discretion. State v. Mixon, 983 S.W.2d 661, 675 (Tenn. 1999).

In the instant case, the record reveals that Wiseman's selling carjacked cars from his used car lot resulted in his pleading guilty to misdemeanor theft. Therefore, Tennessee Rule of Evidence 609 is the applicable rule. Pursuant to Rule 609, the trial court properly allowed the appellant to ask Wiseman if he had been convicted of misdemeanor theft because theft is a crime of dishonesty. See State v. Addison, 973 S.W.2d 260, 268 (Tenn. Crim. App. 1997) (stating that theft is a crime of dishonesty). However, the underlying facts of the conviction were inadmissible. See Long v. State, 607 S.W.2d 482, 485 (Tenn. Crim. App. 1980); see also Neil P. Cohen, et al., Tennessee Law of Evidence, § 6.09[11][f] (4th ed. 2000) (citing Long and stating that "[i]f a criminal conviction is used to impeach under Rule 609, counsel . . . is precluded from inquiring about the details of the offense"). Therefore, the appellant's questioning Wiseman about the underlying facts of the conviction would have been improper, and the trial court did not abuse its discretion by ruling that the facts underlying the conviction were inadmissible as impeachment evidence.

### D. Consecutive Sentencing

Finally, the appellant claims that the trial court erred by ordering him to serve his sentences consecutively. The State argues that the trial court properly ordered consecutive sentencing. We agree with the State.

No witnesses testified at the sentencing hearing. However, the State introduced the appellant's presentence report into evidence. According to the report, the then twenty-nine-year-old appellant dropped out of school in the twelfth grade. He stated in the report that his mental and physical health were good but that he smoked marijuana from ages seventeen to twenty-four. The appellant also reported that he began drinking alcohol when he was thirteen but that he stopped drinking when he was twenty-four. The appellant reported that he worked for McDonald's for four months in 1992, Sysco for two months in 1993, and Logan's Brick Mason for twelve months in 1999. The report shows that the appellant has three prior felony convictions for possession of a Schedule II drug; three convictions for misdemeanor possession of marijuana; three convictions for driving on a suspended, cancelled, or revoked license; and one conviction for misdemeanor assault. The appellant also stated in the report that he was wanted in Dyersburg for violating probation.

The trial court determined that the appellant should be sentenced as a Range II offender and applied enhancement factors (2), that the appellant "has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," and (9), that the appellant "has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." See Tenn. Code Ann. § 40-35-114(2), (9). The trial court also applied enhancement factor (6), that the appellant "treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense," on the basis that Wiseman's being forced to hear the shooting of his brother constituted exceptional cruelty. See Tenn. Code Ann. § 40-35-114(6). In mitigation, the trial court applied factor (13) because the appellant got out of the Stratus after Norris Ray and, therefore, may have hesitated about committing the crimes. See Tenn. Code Ann. § 40-35-113(13). The trial court sentenced the appellant to life for the murder conviction, thirty-five years for the especially aggravated kidnapping conviction, a Class A felony, and three years for being a felon in possession of a weapon, a Class E felony. Regarding consecutive sentencing, the trial court ruled that the appellant had an extensive criminal history and was a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." See Tenn. Code Ann. § 40-35-115(b)(2), (4).

The appellant argues that consecutive sentencing was improper in this case. Specifically, he contends that he does not have an extensive criminal history because he only has three prior felony convictions and they were drug convictions, not crimes of violence. The appellant also argues that the trial court erred by finding that he was a dangerous offender and that the trial court "did not point out any specific findings to support its position."

Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-102, -103,

-210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Although not raised by the appellant, we initially note that the trial court improperly applied enhancement factor (6) regarding the appellant's treating Kevin Wiseman with exceptional cruelty during the commission of the offenses. This factor is generally applied to cases involving abuse or torture. State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995). Before a trial court may apply enhancement factor (6) to increase a sentence, the facts of the case must support a "finding of cruelty under the statute 'over and above' what is required to sustain a conviction for [the] offense." State v. Arnett, 49 S.W.3d 250, 258-59 (Tenn. 2001). We do not believe the facts of this case support the trial court's application of enhancement factor (6). Nevertheless, the proper application of the remaining two factors supports the length of the appellant's sentences.

Turning now to the issue of consecutive sentencing, Tennessee Code Annotated section 40-35-115(b) provides that a trial court may impose consecutive sentences if the defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . . ;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

Regarding the appellant's having an extensive criminal history, the appellant's presentence report shows that he has been committing crimes since he was twenty years old. He has three prior felony drug convictions, six misdemeanor convictions, and has violated probation. He also admitted to drinking under age and smoking marijuana for seven years. We conclude that the appellant's prior convictions and his drug use demonstrate an extensive criminal history that justifies consecutive sentencing.

The trial court also found the appellant to be a dangerous offender who has no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-335-115(b)(4). In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), by itself, was not sufficient to sustain consecutive sentences. If the defendant is found to be a dangerous offender under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the "Wilkerson factors." Id. Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

In the instant case, the trial court stated as follows:

> I think what's most troubling about this case is the brazen nature of how it was carried out - pulling up to this car lot, broad daylight, walking up to these men, putting guns on them, putting them in the trunk of the car and the backseat of the car, and off they go and boom, they kill the one they wanted to kill, dumped him out on the lot, and off they go. I mean, it's just - it would almost lead one to believe that it was a contract killing. I mean, according to the verdicts that the jury has returned, it was so methodically carried out that it's pretty unsettling. It's not like some argument erupted and somebody got shot in the middle of an argument. This was just a real planned methodically-executed execution. So that's very troubling to me as a citizen of Shelby County. So I do think that consecutive sentences are necessary in this case; that they reasonable relate to the severity of the offenses committed and that they're necessary in order to protect the public from further serious criminal conduct of each of these defendants.

The trial court in the instant case specifically addressed the Wilkerson factors. Moreover, despite the appellant's claim to the contrary, the trial court made specific findings regarding the factors, stating that the brazenness and methodical planning of the crimes was "unsettling" and "very troubling." We agree with the trial court that the appellant qualified as a dangerous offender and that consecutive sentencing was proper in this case.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

                               _____

                               NORMA McGEE OGLE, JUDGE