IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2004

## STATE OF TENNESSEE v. BILLY HARRIS

**Appeal from the Criminal Court for Shelby County**
**Nos. 01-02675, 01-02676     W. Otis Higgs, Judge**

---

**No. W2003-01911-CCA-R3-CD  - Filed August 4, 2004**

---

The defendant, Billy Harris, was convicted by a Shelby County Criminal Court jury of rape and three counts of aggravated kidnapping, Class B felonies.  The trial court sentenced him as a Range I offender to ten years for each conviction and ordered that the sentences for the aggravated kidnapping convictions be served concurrently to each other but consecutively to the rape sentence for an effective sentence of twenty years in the Department of Correction.  In this appeal, the defendant raises many issues, including that the evidence is insufficient to support the convictions, that the trial court should have merged his aggravated kidnapping convictions, and that his sentences are excessive.  We conclude that the evidence is sufficient but that the trial court should have merged the aggravated kidnapping convictions.  In addition, we hold that the trial court incorrectly applied at least one enhancement factor and believed that the presumptive sentence for a Class B felony was the midpoint in the range rather than the minimum in the range.  See T.C.A.§ 40-35-210(c). Regarding the defendant's remaining issues, we hold that they have been waived because the defendant failed to file a timely motion for new trial and that no plain error exists.  We remand the case for entry of an appropriate judgment for aggravated kidnapping and for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Modified in Part,
Reversed in Part, Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Lance R. Chism, Memphis, Tennessee (on appeal); Robert Wilson Jones, District Public Defender, Robert C. Felkner, and William C. Moore, Jr., Assistant Public Defenders, and Samuel L. Perkins, Memphis, Tennessee (at trial), for the appellant Billy Harris.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Michael Zak, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's kidnapping and raping his ex-girlfriend. The victim testified that about 4:00 p.m. on November 21, 2000, she borrowed her best friend's car and left work in order to pick up her and the defendant's one-year-old son from daycare. She said that she walked out of the daycare center with the baby and that as she opened the back door to put him in his car seat, the defendant jumped out of the backseat and told her he needed to talk to her. She said a woman came out of the daycare center and asked if the victim wanted her to stay. She said she told the woman to leave because she did not want to make the situation worse. She said she put the baby in the car seat and went to the driver's side of the car. She said that she tried to get in the car but that the defendant pushed her into the passenger seat, got in the driver's side, and drove away. She said that at the time of the incident, she had been living with her best friend for two to three weeks and had an order of protection against the defendant. She said she had lived in her own apartment before but moved in with her friend because the defendant jumped on her, hit her, and threw her to the floor.

The victim testified that the defendant drove her to some apartments on Cossette Place and told her to go to the door of apartment 353. She said the defendant reached into a window beside the apartment's front door and unlocked the door. She said that they entered and that the defendant pulled a gun from his jacket, telling her he was going to kill her and himself. She said that the defendant returned to the car in order to get their baby and that she stood in the apartment and looked around. She said that the defendant could not get the baby out of the car and that he allowed the victim to get the baby. She said that the three of them entered a bedroom, that she laid the baby on the bed, and that the defendant told her to take off her clothes and lie on the bed. She said that the baby was crying and that the defendant left the bedroom in order to fix the baby a bottle. She said that the defendant gave the baby the bottle and that he put his fingers in her vagina and told her, "I'm going to check you, I want to see what you've been doing." She said that the defendant also made her bend over and that he looked at her from behind. She said that the defendant then made her go into a second bedroom and that he put his penis in her vagina but did not ejaculate. She said she was crying and told the defendant no.

The victim testified that the baby was still crying in the other bedroom, that someone knocked on the front door, and that the defendant left the room in order to answer the door. She said the defendant asked the person at the door to keep the baby. She said that the gun was lying on the dresser, that she was trying to remain calm and did not want to make the situation worse, and that she could not grab the gun. She said that the person at the door took the baby, that the defendant returned to the bedroom, and that the defendant allowed her to put on her clothes. She said that she and the defendant left the apartment and that the defendant drove them through an alley. She said the defendant had been enraged earlier but seemed to be calming down. She said that she asked the defendant why he was doing this and that he told her they were a family.

The victim testified that she asked the defendant to take her back to her son and that they returned to the apartment. She said that a woman and some children were in the apartment and that

the woman had her baby. She said that she put the baby in the car and that she and the defendant left again with the victim driving. She said that she dropped the defendant off around the corner from the apartment and that she returned to work. She said that her best friend was waiting for her and that her friend and a security guard telephoned the police. She said she gave a statement to the police and took them to apartment 353. She said the police took her to the Memphis Sexual Assault Resource Center where a counselor examined her.

On cross-examination, the victim acknowledged that she and the defendant had been in an "on again, off again, arguing relationship." She said that she and the defendant had lived together but that she had moved into her own apartment. She said she later moved in with her best friend because the defendant kicked in her doors, telephoned her all the time, and would not leave her alone. She said this was her second order of protection against the defendant and acknowledged that she withdrew the first order. She denied contacting the defendant while the first order of protection was in effect but said the defendant contacted her. She said that while the first order was in effect, she saw the defendant once at his aunt's house. She acknowledged that she visited the defendant in jail almost immediately after he was arrested in this case and that she loaned him money. She denied knowing that the defendant had another girlfriend or making up her story in order to get the defendant into trouble. She said the defendant worked and supported her and the baby. On redirect examination, the victim testified that she got the second order of protection on November 13, 2000. She said that according to the second order, she and the defendant had to schedule the defendant's visitation with the baby through the defendant's aunt, Evia Harris. She said that she did not leave the daycare center willingly with the defendant and that she gave him money in jail because she felt sorry for him.

Cheryl Laquita Stafford testified that on the afternoon of November 21, 2000, she was picking up her children from daycare and saw the victim and the defendant. She said that they appeared to be arguing and that as she approached her car, the victim asked her not to leave the victim. She said the victim told her that the defendant was not supposed to be near her. She said that she put her children in the car and that the victim asked her to get the victim's baby out of the victim's car. She said that the defendant had his hand in his right pocket and that she thought he might have a gun. She said that she wanted to help the victim but that she did not feel safe. She said that she asked the victim to step away from her car, that she got in her car, and that she drove away. She said she stopped and used her cellular telephone to call the daycare center. She said she told the daycare center's director that the victim was outside and being attacked by the victim's ex-husband. On cross-examination, she said that it was dark outside at the time of the incident but that she could see what was going on. She acknowledged that it was cold outside and that the defendant may have had his hands in his pockets because he was cold. She said she heard the victim or the defendant mention a gun during the altercation but could not tell which one said something about a gun. She said she did not telephone the police because the daycare director had said she would handle the problem.

Janice Taylor, the owner of Joshua's Learning Tree Day-Care, testified that about 5:15 p.m. on November 21, 2000, she heard noises outside the daycare center. She said Cheryl Stafford

telephoned her and told her that the victim was begging Ms. Stafford not to leave her in the parking lot. She said Ms. Stafford was afraid and told her the defendant may have a gun. She said she looked outside and saw the defendant pushing the victim into a car. She said she wanted to telephone the police but did not call them because she could not see the car's license tag number and believed she did not have enough information to report the incident. She said she telephoned the victim's mother. On cross-examination, Ms. Taylor testified that although it was dark, she could see very well. She acknowledged that she did not see a gun and that she told the police the defendant had both of his hands in his pockets.

Bernita Henley testified that she and the victim were best friends and worked in the same building downtown. She said that on the afternoon of November 21, 2000, she loaned the victim her car in order for the victim to pick up the victim's baby from daycare. She said that she had loaned the victim her car before, that the victim had always returned the car on time, and that the victim was supposed to return the car about 5:30 p.m. She said that when the victim had not returned to work by 5:30, she became worried and telephoned the victim's mother. She said the victim had been living with her for about a month because the victim and the defendant had an altercation. She said that based on what the victim's mother told her, she got nervous. She said that she waited for the victim in the parking lot and that the victim pulled into the parking lot about 6:30 p.m. She said the victim jumped out of the car and was hysterical. She said that the victim's clothes were hanging and that the victim told her the defendant had a gun and had raped her. She said that a security guard telephoned the police, that the victim's mother and the police arrived, and that the police took the victim to the Sexual Assault Resource Center. On cross-examination, Ms. Henley testified that she did not have any feelings for the defendant and denied that the victim's seeing the defendant upset her. She said she allowed the victim to use her car whenever the victim needed it and would be surprised to learn that the victim used the car to visit the defendant. She said that when the victim entered the parking lot, the victim's clothes were not torn.

Linda Woodard, the victim's mother, testified that on November 21, 2000, she received a telephone call from someone at her grandson's daycare center. She said she became hysterical after the caller told her the victim had left the center with the defendant. She said that when her husband got home from work, they drove to the daycare center but that no one was there. She said they drove to the victim's workplace and saw the victim in the parking lot. She said the victim ran to her, was hysterical and crying, and told her that the defendant had raped her.

Officer Thomas Parker testified that he worked for the Memphis Police Department on November 21, 2000, and responded to a criminal assault call downtown. He said the victim told officers she had been raped and took them to 353 Cossette Place. He said the defendant's ex-girlfriend answered the door, told them the defendant was not there, and allowed them to look around the apartment. He said that the layout of the apartment was exactly as the victim had described and that a child in the apartment told another officer that the defendant was at Keith Wilmer's apartment, which was a few doors down. He said officers went to Mr. Wilmer's apartment and found the defendant hiding in a bedroom closet. He said officers arrested the defendant and patted him down but found no weapons. He said that he transported the defendant to jail and that

the defendant went from being angry and cursing to crying. He said the defendant also uttered that he was going to kill the victim, himself, and their baby. Officer Parker testified that based on what the victim told him, he filled out an arrest ticket. He acknowledged that on the ticket, he did not write that the defendant digitally penetrated the victim. He said that officers looked for a gun but never found one.

Officer Kevin M. Shaver of the Memphis Police Department testified that he was dispatched to 353 Cossette Place about 8:30 p.m. on November 21. When he arrived, officers at the scene told him that someone had been raped in the apartment. He said that he talked to a woman who lived in the apartment and that he took photographs of the apartment's front door and a window to the left of the front door. He said that the window was open slightly and that the police believed someone had entered the apartment by putting his or her hand through the window and opening the door. He said that he collected sheets and pillowcases from a bed and that the sheets looked dirty. On cross-examination, Officer Shaver acknowledged that nothing in his crime scene report stated that the window beside the door was open.

Sally Discenza, a forensic nurse examiner for the Memphis Sexual Assault Resource Center, testified that she examined the victim about 10:00 p.m. on November 21, 2000. She said she took a blood sample from the victim, collected vaginal swabs, and prepared a vaginal slide. She said she also used a hair lifter to collect evidence from the victim's pubic area and collected the victim's underwear. She said the victim told her the following: The defendant hid in the victim's car while the victim was in the daycare center. When the victim returned to the car, the defendant held her at gunpoint and drove her to his ex-girlfriend's apartment. He told the victim that he was going to check her to see if she had been having sex and vaginally penetrated her. The defendant also threatened to kill the victim and their baby. Ms. Discenza testified that she did not see any trauma to the victim but that failing to find injury was not uncommon in sexual assault cases. She said the victim told her that the defendant did not ejaculate and that the victim had not had sexual intercourse within the last four days. On cross-examination, Ms. Discenza testified that the victim appeared "controlled."

Donna Wilson, a forensic scientist with the Tennessee Bureau of Investigation, testified that she examined the evidence collected from the victim. She said that she did not find semen or sperm on the victim's vaginal swabs or slide and that she found one sperm head on the victim's underwear. She said that she found genetic material on the victim's underwear and that the victim was the major contributor of the material. She said, though, that she found genetic material consistent with the defendant's DNA profile in one area of the victim's underwear. She did not test any bedsheets or pillowcases. On cross-examination, Ms. Wilson testified that she did not test the evidence until August 2002 and that she could not say the genetic material found on the victim's underwear belonged to the defendant. She said the fact that the sperm's tail was missing indicated that the sperm may have been one or two days old.

The state introduced into evidence the order of protection that the victim filed against the defendant on November 13, 2000. Attached to the order is a statement by the victim in which she

stated that on August 6, 2000, the defendant went to the victim's apartment, threw her to the floor, and tore off her clothes. The victim also alleged in the statement that on October 29, 2000, the defendant came to her home, struck her in the face five times with his fist, kicked her in the back and on her legs, and hit her across the back with a mop handle.

Evia Harris, the defendant's aunt, testified for the defendant that at the time of the crimes in question, the defendant had been living with her off and on. She said that she had been named as an intermediary in the victim's order of protection and that the victim would take the baby to her house. She said that one day, the victim brought the baby to her home and waited for the defendant to return from work. She said that when the defendant got home, the victim and the defendant talked in her driveway. She said that the victim and the defendant saw each other again and that they acted normally during both meetings. She said the victim also telephoned her home several times and spoke with the defendant. She said she knew that the victim telephoned her home because the victim's cellular telephone and work numbers appeared in her caller identification box. On cross-examination, Ms. Harris acknowledged that she had been trying to help the defendant stay out of trouble. She said she did not know if the defendant had guns, but she acknowledged that he had been known to use a gun before.

Maria Alexander testified that she and the defendant had three children together and that they currently were in a romantic relationship. She said that on November 21, 2000, she was living at 353 Cossette Place and that the defendant came to her apartment that morning. She said she borrowed the defendant's car, took the defendant to his aunt's house, and went to her mother's house. She said she left her mother's home about 5:45 p.m., picked up her children from daycare, and returned to her apartment. She said that a white car pulled up to her apartment and that the defendant and another person were in the car. She said that she could not see the other person and that the defendant asked her to watch his son. She said that she took the defendant's baby and that the defendant drove the car away but later returned to her apartment with the victim. She said that the defendant introduced the victim to her and that the victim was hugging and kissing the defendant. She said that the victim told her the victim had to return a friend's car and that the victim and the defendant got their baby and left the apartment. She said that her apartment had been locked that day and that she had not noticed anything wrong with her door or window. She said that her bed had been neat when she left the apartment that morning and that it was still neat when she returned. She said that she had known the victim and the defendant were dating, that the victim was not crying, and that she had not seen any signs of a struggle or torn clothing on the victim. She said that later that night, the police came to her apartment and she told them the defendant might be at a friend's house.

On cross-examination, Ms. Alexander testified that she had known the defendant for about ten years. She said that he did not pay child support and that she visited him in jail whenever she could. She said that on November 21, the defendant was not living with her and did not have permission to be in her apartment. She said the defendant did not have a key to her apartment and could not get in the apartment if she was not there.

Officer Kevin Shaver testified on rebuttal that he spoke with Maria Alexander on November 21 and that Ms. Alexander told him the defendant was able to get into her apartment through a window next to the front door. He said he examined the front door and saw no signs of forced entry.

The defendant introduced into evidence the statement that the victim gave to the police the day after the crimes. In the statement, the victim gave almost an identical account of the crimes as she did at trial. She also said in the statement that she was not injured during the incident. Although the defendant had been charged with aggravated rape, the jury convicted him of the lesser included offense of rape. The jury also convicted the defendant of three counts of aggravated kidnapping.

The defendant claims that (1) the evidence is insufficient to support the convictions; (2) the trial court erred by allowing hearsay into evidence; (3) the trial court erred by not following the procedural requirements of Rule 404(b), Tenn. R. Evid., and by allowing the jury to hear about the defendant's prior bad acts; (4) the trial court erred by not questioning a juror when the trial court learned that the juror knew a state witness; (5) the trial court erred by playing for the jury an audiotape of witnesses' testimony; (6) the trial court gave an erroneous jury instruction on kidnapping; (7) the trial court should have merged his aggravated kidnapping convictions; and (8) his sentences are excessive. We note that the defendant filed an untimely motion for new trial and that only issues which would result in a dismissal, rather than a new trial, may be considered when the motion for new trial is filed late because all other issues contained in the motion are considered waived. See T.R.A.P. 3(e); State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). However, we do not believe that a defendant's failing to file a timely new trial motion will waive a double jeopardy claim if support for the claim is apparent from the face of the record. See Menna v. New York, 423 U.S. 61, 62, 96 S. Ct. 241, 242 (1975) (reversing, per curiam, a state decision that a guilty plea "waived" a double jeopardy claim); State v. Rhodes, 917 S.W.2d 708 (Tenn. Crim. App. 1995) (stating that defendant's guilty plea did not waive a double jeopardy claim when support for claim was apparent from face of the record). Thus, we will consider the defendant's claims that the evidence is insufficient to support his convictions, that the trial court should have merged his aggravated kidnapping convictions, and that his sentences are excessive. His remaining issues, however, are waived.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient to support his convictions. He argues that the victim's account of the crimes is full of inconsistencies and is not credible. He points out that the victim had several opportunities to summon help and that the defendant even left her alone with the gun, which she failed to grab. He notes that no DNA evidence conclusively links him to the crimes and argues that the victim made up her story because she was angry about his being in a romantic relationship with Maria Alexander. The state claims that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The victim testified that the defendant forced her into her best friend's car and drove her to 353 Cossette Place. Witnesses testified that the victim and the defendant were arguing outside the daycare center and that they saw the defendant force the victim into the car. Although those witnesses did not see a gun, the victim testified that the defendant pulled a gun from his jacket when they got inside apartment 353. In addition to pulling the gun and saying that he was going to kill them, the defendant digitally penetrated the victim and stuck his penis in her vagina. Several witnesses testified that soon after the alleged crimes, the victim was hysterical, crying, and claimed that the defendant had taken her from the daycare center and raped her. The victim stated that the defendant did not ejaculate, which would explain the lack of DNA evidence. Also, although Sally Discenza did not find any physical trauma to the victim, she said that the lack of physical trauma was not unusual in sexual assaults. The jury heard the testimony and resolved the issues in favor of the state. The weight and value to be given to the evidence are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Viewing the evidence in the light most favorable to the state, a rational jury could have found beyond a reasonable doubt that the defendant kidnapped the victim from the daycare center and raped her in the apartment. The evidence is sufficient to support the convictions.

## II. MERGER

The defendant contends, and the state concedes, that the trial court should have merged his aggravated kidnapping convictions. The indictments reflect that the state charged the defendant with three counts of aggravated kidnapping based upon three alternative theories: that the defendant falsely imprisoned the victim (1) to facilitate rape; (2) with the intent to terrorize her; and (3) while possessing a deadly weapon. Although the jury found the defendant guilty of all three counts, "double jeopardy protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969). When a jury convicts under alternative theories, "a merger and imposition of a single judgment of conviction protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed 'charges' or 'convictions.'" State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997); see also State v. Howard, 30 S.W.3d 271, 275 (Tenn. 2000). The trial court should have merged the three separate convictions for aggravated kidnapping and should have entered a single judgment of conviction.

## III. EXCESSIVE SENTENCES

The defendant claims that the trial court erred by applying certain enhancement factors and by ordering that he serve his sentences consecutively. The state acknowledges that the trial court improperly applied one or two enhancement factors but contends that the defendant's ten-year sentences are proper. The state also contends that the trial court properly ordered consecutive sentencing because the defendant is a "dangerous offender" pursuant to T.C.A. § 40-35-115(b)(4). We conclude that the trial court improperly applied several enhancement factors in this case. Moreover, the trial court sentenced the defendant based upon the incorrect belief that the presumptive sentence for a Class B felony was the midpoint in the range rather than the minimum in the range. See T.C.A.§ 40-35-210(c). Finally, we are unable to discern from the record the trial court's reason for imposing consecutive sentencing pursuant to T.C.A. § 40-35-115(b). However, given that the presentence report is not in the record before us, this court cannot conduct its own de novo review of the sentences and must remand the cases for resentencing.

At the sentencing hearing, the victim testified that she and the defendant used to live together but had problems throughout their relationship because the defendant was physically and mentally abusive. She said the defendant finally left her apartment but returned one day and hit her in the face, dropped her on the floor, hit her in the back with a mop handle, and drug her down the back steps. She said that she immediately moved in with her best friend but that the defendant telephoned her at work constantly. She said that a week or two later, the present crimes occurred. She said that she was terrified of the defendant and that the time he had been confined in jail was the best time of her life. She said she was afraid the defendant would get out of prison and come after her again. She said that she wanted the defendant to pay for what he had done to her and that he should serve twenty years in confinement.

On cross-examination, the victim acknowledged that while she and the defendant were living together, the defendant would leave her for a while but that she would let him return. She also acknowledged that she never changed the locks to her apartment. She said, though, that she was afraid of him and that he had kicked in the doors to her apartment before. She said that she visited the defendant in jail twice after he was arrested for the offenses and that she gave him money. She said that she no longer loved the defendant and that he would not stay away from her unless he was confined. She said that she had not spoken to the defendant and acknowledged that he had not bothered her since he had been in jail.

The defendant testified that he had been in jail for twenty-nine months and that he would not bother the victim again. He said that he loved the victim but realized that she no longer wanted him in her life. He said that he would like to know how his son was doing but that he could check on his son without contacting the victim. He said that the victim had visited him in jail, had cried, and had told him that she did not want to see him in jail. He said he was angry but was not angry at the victim and would not do anything to her.

On cross-examination, the defendant testified that he did not kidnap or rape the victim and did not tell a police officer that he was going to kill himself, the victim, and their son. He said that the state offered to let him plead guilty to a sex offense in return for a sentence of eight years on probation but that he refused to plead guilty to a sex crime. He said he had a prior conviction for involuntary manslaughter that resulted from his accidentally shooting and killing his cousin. He said he did not have a gun on November 21, 2000, but acknowledged violating the victim's order of protection. He said that he had violated the order because he and the victim had loved each other and because he was trying to get his family back. He said that he had forgiven the victim for having him incarcerated. Although the trial court's Findings of Fact Form notes that a presentence report was requested, neither party introduced the report into evidence.

The trial court stated that as a Range I offender convicted of Class B felonies, the defendant was facing eight- to twelve-year sentences. See T.C.A. § 40-35-112(a)(2). The trial court also noted that as a standard offender, the defendant would serve thirty percent of his sentences. See T.C.A. § 40-35-501(c). Based on the defendant's prior involuntary manslaughter conviction, the trial court applied enhancement factor (2), that the defendant had a "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range." See T.C.A. § 40-35-114(2). The trial court also applied enhancement factor (5), that the victim was particularly vulnerable because of her age or physical or mental disability, due to the fact that the defendant had hit the victim while she was pregnant with their child, and factor (6), that the defendant treated the victim with exceptional cruelty, because he raped her in his ex-girlfriend's apartment. See T.C.A. § 40-35-114(5), (6). The trial court applied factor (7), that the personal injuries inflicted on the victim were particularly great, because the victim suffered emotional injuries as a result of the crimes. See T.C.A. § 40-35-114(7).

The trial court applied factor (8), that the defendant committed the offenses against a victim in order to gratify his desire for pleasure or excitement, on the basis that the defendant raped the victim "in another woman's bed with the other woman outside the door getting the child." See T.C.A. § 40-35-114(8). The trial court held that defendant's violating the order of protection warranted applying factor (9), that the "defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community," and that his using a gun to commit the offenses warranted applying factor (10), that the defendant possessed a firearm during the offenses. See T.C.A. § 40-35-114(9), (10). Finally, the trial court applied factor (11), that the defendant "had no hesitation about committing a crime when the risk to human life was high"; factor (12), that the "felony resulted in . . . bodily injury or involved the threat of death or bodily injury . . . and the defendant has previously been convicted of a felony that resulted in death or bodily injury"; and factor (17), that the defendant committed the crime "under circumstances under which the potential for bodily injury to a victim was great." See T.C.A. § 40-35-114(11), (12), (17). The trial court applied no mitigating factors. See T.C.A. § 40-35-113.

The trial court stated that the presumptive sentence was the midpoint in the range, or ten years, for each conviction. However, despite having found ten enhancement factors applicable, the trial court held that a ten-year sentence was appropriate for each conviction. Regarding consecutive

sentencing, the trial court stated that "under these circumstances where the defendant has violated a court order, kidnapped a lady off the street, and taken her to a location as she has indicated, I think this case deserves consecutive time and so be it."

When a defendant appeals the length, range, or manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. T.C.A. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

The defendant was sentenced as a Range I offender for which the applicable range for a Class B felony is eight to twelve years. T.C.A. § 40-35-112(a)(2). The presumptive sentence for a Class B felony is the minimum in the range when no enhancement or mitigating factors are present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Ashby, 823 S.W.2d at 169.

The defendant contends that the trial court improperly applied all of the enhancement factors except for factor (2). The state acknowledges that the trial court misapplied enhancement factor (5), that the victim was particularly vulnerable, because the defendant's having hit the victim while she was pregnant with their child is not related to the present offenses. We agree with the state and note that in addition to the misapplication of factor (5), the trial court misapplied factors (6) and (7). Regarding factor (6), that the defendant treated the victim with exceptional cruelty, application of this factor is usually found in cases of abuse or torture. See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995). Moreover, proper application of this factor requires a finding of cruelty "over and above" what is required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001). The fact that the defendant took the victim to his ex-girlfriend's apartment in order to rape her does not amount to exceptional cruelty. Regarding factor (7), that the victim suffered particularly great personal injuries, Sally Discenza found no physical trauma to the victim and the victim said in her statement to police that the defendant did not injure her. Personal injuries encompassed by this enhancement factor may also include emotional and psychological injuries. See State v. Hoyt, 928 S.W.2d 935, 948 (Tenn. Crim. App. 1995). However, nothing in the record before us demonstrates that the victim suffered particularly great emotional injuries. See id. Finally, we believe that the trial court improperly applied factor (9), that the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community, on the basis that the defendant violated the order of protection.

-11-

In addition to misapplying enhancement factors, the trial court sentenced the defendant based upon the incorrect belief that the presumptive sentence for a Class B felony was the midpoint in the range and made no findings for ordering consecutive sentencing pursuant to the criteria listed in T.C.A. § 40-35-115(b). Ordinarily, these errors would eliminate the presumption of correctness and result in this court's determining the appropriate sentences. However, the presentence report was not made an exhibit at the sentencing hearing, is not in the record before us, and prohibits us from conducting a proper de novo review. Therefore, we must remand the cases for resentencing. We note that although the trial court stated at the sentencing hearing that the defendant would serve thirty percent of his sentences, the judgment forms reflect that the defendant was sentenced as a violent offender. Because the defendant was convicted of aggravated kidnapping and rape, he is statutorily required to serve one hundred percent of his sentences with the potential to have his sentences reduced fifteen percent for sentence reduction credits. See T.C.A. § 40-35-501(i).

## IV. PLAIN ERROR

Although the defendant's failure to file a timely motion for new trial has waived his remaining issues, he claims that the errors constitute plain error. This court has the discretion to notice an error that has affected the substantial rights of an accused when necessary to do substantial justice. Tenn. R. Crim. P. 52(b). The following factors should be considered in determining the existence of plain error:

> "(a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). As noted in Adkisson, "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." 899 S.W.2d at 642.

The defendant claims that the trial court committed plain error by allowing hearsay into evidence; by not following the procedural requirements of Rule 404(b), Tenn. R. Evid., and by allowing the jury to hear about the defendant's prior bad acts; by not questioning a juror when the trial court learned that the juror knew a state witness; by playing for the jury an audiotape of witnesses' testimony; and by giving an erroneous jury instruction on kidnapping. While the record demonstrates that the defendant requested a 404(b) hearing and that the trial court should have held

a hearing regarding the defendant's request to exclude prior bad act evidence, the trial court's error does not rise to the level of plain error. Moreover, we discern no plain error regarding the defendant's remaining claims.

In consideration of the foregoing and the record as a whole, we affirm the defendant's convictions. However, we hold that the trial court erred by not merging the defendant's aggravated kidnapping convictions and by misapplying several enhancement factors to the defendant's sentences. We remand the case for modifying the judgments to reflect that the aggravated kidnapping convictions in counts two and three are merged into count one in case number 01-02676 and for resentencing.

_____
JOSEPH M. TIPTON, JUDGE