IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

SEPTEMBER 1995 SESSION

FILED

November 20, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9503-CR-00078 |
| | ) | |
| | ) | Shelby County |
| v. | ) | |
| | ) | Honorable James C. Beasley, Jr., Judge |
| | ) | |
| MICHAEL ADDISON, | ) | (First degree Murder) |
| | ) | |
| Appellant. | ) | |

For the Appellant:                For the Appellee:

A.C. Wharton, Jr.                 Charles W. Burson
District Public Defender          Attorney General of Tennessee
        and                               and
W. Mark Ward                      William David Bridgers
Assistant Public Defender         Assistant Attorney General of Tennessee
201 Poplar Avenue                 450 James Robertson Parkway
Suite 201                         Nashville, TN 37243-0493
Memphis, TN 38103-1947

                                  John W. Pierotti
                                  District Attorney General
                                          and
                                  P. Thomas Hoover, Jr.
                                          and
                                  Paul F. Goodman
                                  Assistant District Attorneys General
                                  201 Poplar Avenue
                                  Suite 301
                                  Memphis, TN 38103-1947

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Michael Addison, appeals as of right from a jury conviction in the Criminal Court of Shelby County for first degree murder. The defendant received a sentence of life imprisonment in the custody of the Department of Correction. In this appeal, he contends that:

> (1) the evidence is insufficient to support his conviction;
>
> (2) the jury's dual findings of guilt for first degree premeditated murder and felony murder violate double jeopardy principles; and
>
> (3) the trial court erroneously allowed evidence of the defendant's prior theft convictions to impeach the defendant's credibility.

We disagree and affirm the judgment of conviction.

On April 2, 1993, Donald Ray Irby was found in the front seat of his car. He had been shot one time in the head, resulting in his death. The car he was driving had crashed into the Three Star Liquor Store. The car was still in gear with the tires spinning, causing the car to overheat and make ruts in the ground.

Sergeant Michael Houston of the Memphis Police Department investigated the crime. He testified that he examined the victim's body at the morgue on April 3, 1993, and noticed a head injury from a gunshot. He also examined the victim's car. The front of the car had been wrecked, two tires were flat, and the front passenger's side window was broken. Sergeant Houston also found mud on the inside of the right front passenger's side and inferred that the door was open while the vehicle was stuck in the mud. Blood was also on the armrest between the front seat and on items lying in the floorboard in the backseat. Sergeant Houston testified that when he went to the back of the liquor store, he noticed a small fence that had been knocked down and ruts in the ground where the wheels of the car had been stuck. He also

2

stated that a few people who operated local businesses told him that although they did not witness the shooting, they heard the noise of the car accelerating at a high rate of speed.

Sergeant Houston also testified that he received a call on April 4, 1993, from a couple of people who identified Michael Dean as the person responsible for shooting the victim and that Annie Lee Fason was with the defendant when the shooting occurred. Dean was the name that the defendant used on occasion. Sergeant Houston questioned the defendant at his office. Sergeant Houston said that the defendant initially denied any involvement in the crime but admitted that he shot the victim with his .357 Magnum after being told that the officers were aware that Fason witnessed the shooting. The defendant then gave a statement regarding his actions.

The defendant's statement reflects that the defendant admitted shooting the victim on April 2, 1993, around 10:05 p.m. The defendant told the officers that he and Fason had visited her daughter, and that his gun went off as he raised it when arguing with Fason's daughter. He said that he and Fason left and went to Chism Trails Store. While there, he saw the victim and paid him five dollars to take them to South Memphis. The defendant rode in the front passenger seat and Fason sat in the backseat behind the victim. The defendant said that along the way the victim turned off the street and started to drive behind the Three Star Liquor Store. The statement shows that the defendant asked the victim why he was turning off. According to the defendant, the victim started reaching down toward the seat with his hand. The defendant told the officers that he then pulled his .357 Magnum out, pointed it towards the victim, and told him to give him his money back if he was not going to drive them to South Memphis. He said that he then shot the victim one time in the upper body when he started to reach underneath the seat. The statement reflects that the car continued to accelerate, crashing into the back wall of the Three Star Liquor Store. The defendant

3

and Fason exited the car and walked to South Memphis to their homes. The defendant denied that either he or Fason took anything from the victim. He also claimed that Ernest Sanders stole his gun the next day.

Sergeant Houston stated that he questioned Sanders about the gun and that Sanders denied having the gun. Houston said that he never found the defendant's gun. He also testified that he did not find a weapon under the seat of the victim's car.

Arthur Townes testified that he was shooting pool at Earl's Barbecue located next door to the liquor store on April 2, 1993, around 9:30 or 10:00 p.m. He stated that while shooting pool he noticed several people leaving and going around the building. He said that he left and walked around the building and that he saw several people standing around a car. Townes recalled seeing flames coming from underneath the car. He testified that he believed that the car had been in gear and running for a long time because the exhaust system was red. Townes stated that he then walked up to the car, opened the door, and saw the victim inside. Townes said that the car was filled with smoke. Believing the victim was drunk, Townes, with the help of his brother, pulled the victim from the car and then turned the engine off. Townes testified that he did not notice a weapon on the victim or in the car. He also testified that he thought the vehicle would explode if the engine had not been turned off.

Jeffery Smith, an acquaintance of the victim's family, testified that he was with his grandfather at the Three Star Liquor Store on April 2, 1993, around 10:00 p.m. He stated that his grandfather told him that he heard a loud rumbling sound as he left the car. Smith said that he also heard the noise when he got out of the car and that it was coming from the back of the building. Smith testified that he saw a car behind the building idling real loudly as he looked over a wooden fence. He and his grandfather then went around the building, and he saw fire shooting up from the bottom of the car.

4

When Townes pulled the victim from the car, Smith walked over and removed the victim's black leather coat. Smith said that he took the jacket to the victim's mother and told her that the victim had been shot. Smith and the victim's mother then returned to the scene. Although Smith testified that he did not see a gun on the victim or around the car, he acknowledged telling the officers that he noticed the jacket was heavy when he picked it up.

Annie Lee Fason testified that she had known the defendant, whom she also knew as Michael Dean, for approximately four or five years. She said that on April 2, 1993, the defendant asked her to come with him to visit his son, the grandson of Fason, at her niece's house. While at her niece's house, an argument ensued between the defendant and Fason's daughter and niece because the defendant permitted the child to handle his gun. According to Fason, the defendant took the gun from the table and fired it. Fason said that she and the defendant then left and walked to Chism Trail to use a public telephone to call a cab. While the defendant was on the phone, the victim drove up. The defendant asked him for a ride home. Fason stated that the victim agreed but that he told them that he could not take them all the way home.

Fason testified that the defendant had the gun under his pants when he got into the victim's car. She recalled that when the victim started driving, the defendant pulled the gun out, pointed it at the victim's head, and said, "Look what I got. See what I got." The victim replied, "Yeah man I see it, okay." Fason said that she never saw the victim with a weapon. Although Fason asked the defendant not to do it, the defendant shot the victim. Fason testified that the victim was turning the vehicle when he was shot. She stated that the victim was trying to do what the defendant told him to do. Fason also testified that after the defendant shot the victim, the car ran into a wooden fence and stopped. She said that the motor was still running. She started yelling, and the defendant got out of the car.

5

Fason stated that the defendant pointed the gun at her and grabbed her arm, ordering her out of the car and threatening to kill her. She said that the defendant told her that he had already killed one person and that killing three or four more people would not mean anything. She also testified that she got out of the car and they started to walk away. At that time, the defendant told her to wait, and he walked back to the car and reached through the window. Fason testified that when the defendant walked back, the defendant told her that he took a chain from the victim's neck and asked her whether she wanted it. She said that she declined the defendant's offer and explained that she did not run away because she was afraid the defendant would shoot her.

Fason said that they then walked towards their homes. Along the way, they stopped at a service station because the defendant wanted to purchase beer. At that time, Fason flagged a cab down and went to her sister's house. Fason stated that the defendant came to her sister's house and asked where she was. When her sister told the defendant that she had already left, he went away.

On cross-examination, Fason admitted that she and the defendant had been drinking that day. She conceded that she did not attempt to help the victim or contact the police regarding the shooting. However, she denied that the gun belonged to her and that she was showing off the gun at her niece's house.

W. J. McNabb of the Memphis Police Department conducted the crime scene investigation. When he arrived, the victim's car was directly against the Villa Inn next to the liquor store. Officer McNabb stated that the car had driven through a wooden fence that separated the Villa Inn from the liquor store. He said that the car was still in gear when it hit the building, spinning its tires and digging a hole in the ground. He testified that the tires became hot because the engine was running at a high rate of speed, causing them to blow out and disintegrate. He also identified the

6

victim's leather coat that had a small amount of blood on it. Officer McNabb stated that there were two cans of Bicardi Rum mix in the pockets of the jacket. On cross-examination, Officer McNabb said that he could not recall whether the car was running when he arrived.

Willie Lee Irby, the victim's mother, testified that the victim left home to go to Chism Trail Store at approximately three minutes before 10:00 p.m. on April 2, 1993. She said that he was wearing a leather jacket, a gold charm necklace and his class ring. She identified a receipt reflecting the purchase of a necklace. Ms. Irby testified that a man brought the victim's jacket to her approximately twenty minutes after the victim had left and told her that he was dead. She said that she left with him to go to the scene. She stated that she did not remove anything or place anything in the jacket.

Dr. Violet Hnilica, a pathologist, performed an autopsy on the victim. She testified that a single gunshot wound to the head caused the victim's death. According to Dr. Hnilica, the bullet caused severe brain injury and a fractured skull. She stated that the victim suffered no injuries from the impact of the car hitting the building. Dr. Hnilica said that the victim was at least three feet away from the shooter because there was no residue near the wound itself.

Andrea Dean, the defendant's sister, testified that on the day of the crime, she, Fason, Fason's son-in-law, and the defendant rode around together and drank beer for approximately two or three hours. Later that evening, they dropped her off at the home of Fason's niece. She said that the defendant and Fason returned a few hours later, but left again when the defendant began arguing with Fason's niece and daughter and a shot was fired. Ms. Dean testified that she saw Fason with a gun before and after they picked up the defendant to go riding. She recalled seeing Fason hand the gun to the defendant. She denied that Fason took the defendant's gun from

7

some children who were playing with it. She further denied that the defendant owned a gun. She also said that the defendant did not have a vehicle on the day of the crime.

The defendant testified that he also went by the name of Michael Dean. He stated that on April 2, 1993, he went with Ms. Dean and Fason to drink beer. He stated that they later went to the home of Fason's niece. He said that he and Fason left her home after he argued with Fason's daughter and niece and the gun accidentally went off when he pulled it from his pants. They walked to Chism Trail Store and asked the victim for a ride home. The victim agreed and started driving south, stopping once at a gas station to get gas. According to the defendant, the victim turned off the street and pulled behind the Three Star Liquor Store. The defendant said that he asked the victim where he was taking him and to stop the car and let him out. He testified that as he tried to open the car door, the victim reached under his seat. The defendant stated that he then pulled the gun from his pants and asked the victim what he was doing. When the victim did not answer him, the defendant told him to stop. According to the defendant, he opened the door, and the victim came up as he had one foot outside the door. The defendant testified that he thought the victim had a weapon. He said that although he could not see if the victim had anything in his hand, he fired the gun once at the victim.

The defendant recalled the car hitting the building and making a lot of noise. He testified that after Fason got out of the vehicle, they walked home. The defendant claimed that the gun belonged to Fason and that Fason was playing with the gun at her niece's house. He said that he told the officers that the gun belonged to him to protect Fason because she was his child's grandmother.

On cross-examination, the defendant denied pointing the gun at Fason, taking the victim's gold chain, and offering the chain to Fason. He also claimed that he

8

paid the victim ten dollars for the ride and that the gun he used to shoot the victim was stolen from his living room the next day.  The defendant conceded that he had prior convictions for theft, receiving stolen property and attempted larceny from a person.

In rebuttal, Janie Gary, the daughter of Fason and a former girlfriend of the defendant, testified that the defendant came to her cousin's house on April 2, 1993, and that the defendant was playing with their son with his gun.  She said that an argument took place regarding the defendant allowing the child to handle the gun.  According to Gary, the defendant yelled, "Bitch I'll kill you" and fired his gun after she and her cousin shoved him out the door.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant was charged with first degree murder in separate counts of an indictment, felony murder in count one and premeditated and deliberate murder in count two.  The jury returned guilty verdicts on each count.  The trial court entered a single judgment of conviction reflecting a conviction for first degree murder and a sentence of life imprisonment.  The defendant contends that there is insufficient evidence to support his conviction for first degree murder.  The state contends that the evidence is sufficient to establish beyond a reasonable doubt the defendant is guilty of first degree murder based on either theory.  We agree.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield,

9

676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

### A. PREMEDITATED AND DELIBERATE MURDER

The defendant first contends that the evidence does not establish beyond a reasonable doubt that the killing was premeditated and deliberate. At the time of the offense, the unlawful, intentional, premeditated and deliberate killing of another constituted first degree murder. See T.C.A. §§ 39-13-201(a) and -202(a)(1) (1991)[1]. Our criminal code defined a deliberate act as "one performed with a cool purpose," and a premeditated act as "one done after the exercise of reflection and judgment." T.C.A. § 39-13-201(b)(1) and (2) (1991). In State v. Brown, our supreme court further defined deliberation as requiring some period of reflection, without passion or provocation, and concluded that the "deliberation necessary to establish first degree murder cannot be formed in an instant." 836 S.W.2d 530, 539, 543 (Tenn. 1992). Premeditation requires a showing of a previously formed design or intent to kill. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). The existence of the separate and distinct elements of premeditation and deliberation is a question of fact to be decided by the jury. See State v. Brown, 836 S.W.2d at 541-42. In this respect, the determination of the state of mind necessary to establish the elements of first degree murder may be shown by circumstantial evidence. State v. Brown, 836 S.W.2d at 541; State v. Burlison, 868 S.W.2d 713, 717 (Tenn. Crim. App. 1993).

In the light most favorable to the state, the proof establishes that the defendant aimed a gun at the victim's head while the victim was giving him and Fason a ride. The defendant told the victim, "Look what I got. See what I got," and the victim replied that he saw the gun as he continued to drive the car. Although Fason asked the defendant not to shoot the victim, the defendant shot the victim in the head as the

---

[1] Pursuant to an amendment effective July 1, 1995, first degree murder was amended, purportedly deleting the requirement of deliberation. See T.C.A. § 39-13-202(a)(1).

10

victim turned the car in response to the defendant's command. Fason stated that the victim did not do anything to provoke the defendant and that the victim was trying to comply with the defendant's orders. Immediately after shooting the victim, the defendant pointed the gun at Fason and threatened her, grabbing her arm to pull her from the car. The defendant started to walk away and then walked back to the car and took a gold chain from the victim's neck. Under these circumstances, the jury reasonably could have concluded that the defendant reflected, without passion or provocation, upon his decision to kill the victim. We conclude that the record supports the jury's determination that the elements of intent, premeditation and deliberation were established beyond a reasonable doubt.

### B. FELONY MURDER

Next, the defendant claims that the evidence does not support a conviction for first degree murder in the form of felony murder. Specifically, he contends that the proof does not establish beyond a reasonable doubt that the killing was committed in the perpetration of an aggravated robbery. He argues that the killing occurred collateral to and not in pursuance of the theft. See State v. Severs, 759 S.W.2d 935, 938 (Tenn. Crim. App. 1988) ("the killing must have been in pursuance of, rather than collateral to, the unlawful act described by the statute"). We disagree.

At the time of the killing, felony murder was defined as the unlawful, "reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." T.C.A. §§ 39-13-201(a) and -202(a)(2) (1991)[2]. A person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person

---

[2]We note that the provision defining felony murder was amended in 1995 to delete the reckless mens rea element. See T.C.A. § 39-13-202. Pursuant to the amendment, "[n]o culpable mental state is required for conviction under [the felony murder] subdivision . . . except the intent to commit the enumerated offenses or acts . . . ." T.C.A. § 39-13-202.

is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-302(c).

In support of his argument, the defendant alleges that there is no proof of a preconceived plan to rob the victim, of an argument between the victim and the defendant, or that the defendant directed the movement of the victim's automobile. The defendant asserts that the evidence establishes that the defendant decided to rob the victim "after-the-fact, separate, distinct and independent from the killing." We do not agree.

The proof viewed in the light most favorable to the state establishes that after obtaining a ride from the victim, the defendant directed the victim to turn off the main street behind the liquor store. He pulled a gun on the unarmed victim and told him, "Look what I got. See what I got." Even though Fason asked the defendant not to shoot the victim, the defendant shot the victim in the head. After leaving the car, the defendant started to walk away but returned to the car to take the victim's gold chain. Although the defendant denied taking the gold chain, the jury chose to believe the testimony of Fason. It was the jury's prerogative to do so. We also believe that the jury was entitled to infer that the defendant ordered the victim to turn behind the liquor store to carry out an intent to rob the victim. The fact that the defendant did not take the victim's leather jacket or wallet or demand the necklace prior to shooting the victim is not determinative. See Mullendore v. State, 183 Tenn. 53, 63, 191 S.W.2d 149, 152 (1945) (evidence that the defendant took the victim's money and appropriated it to his own use permitted the jury to infer that the defendant intended to rob the victim, although no prior intent to rob was otherwise shown). Under these circumstances, we hold that the proof is sufficient to establish beyond a reasonable doubt the defendant's guilt for felony murder.

12

## II.  DOUBLE JEOPARDY

The defendant contends that the jury's dual findings for premeditated and deliberate murder and felony murder violate double jeopardy principles.  He asserts that both verdicts cannot stand, because once the jury returned a guilty verdict on count one, charging felony murder, the guilty verdict on count two, charging premeditated and deliberate murder, was mere surplusage and should have been "rejected" by the trial court.

First, we note that the defendant acknowledges that this issue is being raised for the first time on appeal.  However, he argues that this constitutional error involving double jeopardy should be corrected to prevent manifest injustice.  See, e.g., State v. Goins, 705 S.W.2d 648, 649 (Tenn. 1986).  We would correct it if it were constitutional error, but it is not.

The Double Jeopardy Clause of both the United States and Tennessee Constitutions states that no person shall be put in jeopardy of life or limb for the same offense.  U.S. Const. amend. 5; Tenn. Const. art. I, § 10.  The clause has been interpreted to include the following protections: "It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense."  North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076 (1969).  State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996).  It is the last protection that is of interest in this case.

Although the jury returned guilty verdicts for both counts of first degree murder, the trial court entered only one judgment of conviction that imposed only one sentence of life imprisonment.  Essentially, it is the judgment of conviction that provides the legal authority for the executive branch of government to incarcerate a person who

13

is sentenced to confinement. See State v. Vasser, 870 S.W.2d 543, 546 (Tenn. Crim. App. 1993). In this sense, it includes the imposition of the sentence by which a defendant is punished. See Tenn. R. Crim. P. 32(e). Therefore, the trial court's entry of only one judgment of conviction imposing only one sentence of life imprisonment protects the defendant from receiving multiple punishments for the same offense. No double jeopardy peril exists.

The defendant also argues that the jury's verdict for first degree premeditated and deliberate murder, as charged in count two, should be treated as "surplusage" and set aside. We disagree. Count one and count two charge the same offense of first degree murder, but each alleges a separate means. However, the means are not mutually exclusive. Thus, there is no legal bar to verdicts being returned for both counts. In fact, there are advantages to having the jury make findings on both counts in capital cases because of the impact of State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), when the evidence proves first degree murder only through the perpetration of a listed felony. See James David Carter v. State, No. 03-S01-9612-CR-00119, Greene County, slip op. at 11 n.6. (Tenn. Oct. 20, 1997) (for publication).

We are aware that the supreme court has "vacated" a "conviction" for felony murder while upholding a judgment of conviction entered for premeditated and deliberate murder. See State v. Hurley, 876 S.W.2d 57, 70 (Tenn. 1993). We are also aware that this court has previously stated that guilty verdicts for felony murder and premeditated and deliberate murder, charged in separate counts but for the same crime, should lead to one of the "convictions" being vacated or stricken. See State v. Perry A. Cribbs, No. 02C01-9508-CR-00211, Shelby County, slip op. at 36-37 (Tenn. Crim. App. Feb. 14, 1997).

14

However, we do not believe that the supreme court in <u>Hurley</u> intended for a dismissal to be the only legitimate option available. Likewise, we believe that <u>Cribbs</u> overlooks the fact that when only one killing is involved, the two counts are for the <u>same offense</u> -- first degree murder. The fact that each count alleges a different means of committing the offense does not change that legal fact. Moreover, there is no need to "dismiss," "vacate," or "strike," a particular "conviction" if what is meant by the term "conviction" is the return of the jury verdict of guilt. Rather, the jury verdict stands as a legitimate finding of fact and law which the trial court should preserve by merging the same offense counts into one judgment of conviction for first degree murder that notes the merger of counts with each other. Such is essentially what the trial court did in the present case, although its judgment of conviction is worded "Murder 1st Degree / Murder Perp. Felony" and could be read to indicate that felony murder is different from first degree murder. Such a merger and imposition of a single judgment of conviction protects against double jeopardy and preserves the validity of the jury verdicts for future avoidance of problems related to unnecessarily dismissed "charges" or "convictions." <u>See</u>, <u>e.g.</u>, <u>State v. Davis</u>, 613 S.W.2d 218, 221 (Tenn. 1981). Therefore, the trial court did not err by merging counts one and two instead of dismissing count two.

### III. IMPEACHMENT BY PRIOR THEFT CONVICTIONS

Finally, the defendant contends that the trial court erroneously permitted the state to impeach the defendant's credibility with prior convictions of theft of property, larceny from the person and receiving stolen property. He complains that the trial court failed to consider the similarity of the charged offense to the prior convictions in determining the danger of unfair prejudice. The defendant relies upon the holding in <u>State v. Farmer</u>, 841 S.W.2d 837, 839-40 (Tenn. Crim. App. 1992), that convictions for crimes similar to the one on trial should not be admitted for impeachment because, normally, their prejudicial effect upon the jury would outweigh any probative value. He argues that the state used the convictions to show his propensity to commit aggravated

15

robbery rather than to impeach the defendant's credibility. The state asserts that the prior convictions are not similar to the charged offense because felony murder involves a violent offense against a person regardless of whether the underlying felony is similar. The state also contends that the prior convictions involve crimes of dishonesty, enhancing their probative value for purposes of impeaching the defendant's credibility. See Long v. State, 607 S.W.2d 482, 485-86 (Tenn. Crim. App. 1980). We hold that the trial court did not err in concluding that the probative value on credibility outweighed any unfair prejudicial effect.

Pursuant to the conditions and procedures set forth in Rule 609, Tenn. R. Evid., the credibility of the accused may be attacked by presenting evidence of prior convictions. One condition requires that the trial court find that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. See Tenn. R. Evid. 609(a)(3). In determining the probative value of the prior convictions, the trial court must assess the similarity between the crime on trial and the crime underlying the impeaching conviction. Farmer, 841 S.W.2d at 839. The trial court must next analyze the relevance the impeaching conviction has to the issue of credibility. Id.

Before trial, the state properly notified the defendant of its intent to use the following convictions to impeach the defendant's credibility at trial: (1) a 1983 receiving stolen property conviction, (2) a 1985 receiving stolen property conviction, (3) two convictions for larceny from a person in 1989, and (4) a 1992 misdemeanor theft conviction. The defendant requested and obtained a pretrial hearing to determine the admissibility of the defendant's prior criminal record for impeachment purposes. In its determination that the convictions were admissible for impeachment, the trial court found that the convictions involve issues that directly related to the defendant's credibility. The trial court stated that the mere fact that the homicide was alleged to

16

have occurred during the perpetration of an aggravated theft, such as robbery, did not foreclose the introduction of evidence of the prior convictions or make them unduly prejudicial.

At trial, the defendant asserted on cross-examination that he neither took a gold chain from the victim nor offered a gold chain to Fason, stating that he would not have stolen it from anyone. Later, the prosecutor asked the defendant several questions regarding whether he stole the victim's chain. The defendant once again declared that he did not steal the chain but explained that he was not claiming that he would not steal. The prosecutor then questioned the defendant regarding each one of his prior convictions. The defendant conceded that he had prior convictions for theft, two counts of receiving stolen property, and two counts of attempted larceny from a person.

We hold that the trial court properly concluded that the probative value for credibility was not outweighed by any danger of unfair prejudice. In its decision, the trial court considered the similarity between first degree murder committed during the perpetration of an aggravated robbery and the prior convictions for theft-related offenses. Moreover, the trial court correctly concluded that the crimes of receiving stolen property, larceny from a person, and misdemeanor theft were also crimes of dishonesty. See State v. Crane, 780 S.W.2d 375, 377 (Tenn. Crim. App. 1989) (concealing stolen property); State v. Fluellen, 626 S.W.2d 299, 300 (Tenn. Crim. App. 1981) (robbery); State v. Holtcamp, 614 S.W.2d 389, 394 (Tenn. Crim. App. 1980) (shoplifting). Although the prior convictions were similar to aggravated robbery, their probative value on credibility outweighed the danger of unfair prejudice. For these reasons, we hold that the trial court did not abuse its discretion by permitting the state to impeach the defendant's credibility with his prior convictions.

17

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Joe B. Jones, Presiding Judge

_____
John K. Byers, Senior Judge

18