# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 3, 2013

## STATE OF TENNESSEE v. ALVIN WALLER, JR.

**Appeal from the Circuit Court for Madison County**
**No. 11-723      Donald H. Allen, Judge**

---

**No. W2012-02591-CCA-R3-CD  -  Filed March 21, 2014**

---

The defendant, Alvin "A.J." Waller, Jr., was convicted after a jury trial of especially aggravated kidnapping, a Class A felony, aggravated assault, a Class C felony, and attempted voluntary manslaughter, a Class D felony.  The trial court merged the attempted voluntary manslaughter conviction into the aggravated assault conviction and sentenced the defendant to ten years as a multiple offender on that count.  The trial court sentenced the defendant to thirty years as a multiple offender at one hundred percent for the especially aggravated kidnapping conviction and ordered the two sentences to be served concurrently.  The defendant appeals, challenging only the sufficiency of the evidence.  After a thorough review of the record, we conclude that the evidence is insufficient to support the defendant's conviction for attempted voluntary manslaughter.  In all other respects, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed and Remanded in Part**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

George Morton Googe, District Public Defender; and Gregory D. Gookin, Assistant District Public Defender, for the appellant, Alvin Waller, Jr.

Robert E. Cooper, Jr., Attorney General & Reporter; Deshea Dulany Faughn, Assistant Attorney General; James G. Woodall, District Attorney General; and Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The defendant was indicted for attempted first degree (premeditated) murder, aggravated assault in which he caused the victim bodily injury through the use of a deadly weapon, and especially aggravated kidnapping which was accomplished with a deadly weapon. The charges stem from an incident in which the victim, who accepted a ride from the defendant and then had consensual sexual intercourse with him, was detained by the defendant when she attempted to leave his vehicle. The defendant then shot the victim in the head. The bullet entered her forehead and exited about an inch away, causing no brain injury.

The victim testified that she met the defendant through mutual friends between five and ten years before the shooting but had not seen him in approximately five years. In the early morning hours of August 16, 2011,[1] she was walking home and was a mile or two from her house when the defendant drove up to her and asked if she needed a ride. She recognized him and got into his car, which she described as a gray Malibu. The victim and defendant drove around for about twenty minutes, and then had consensual intercourse in the car, which was parked along the highway near a church with a blue sign.[2] The victim then told the defendant she was ready to leave. The defendant responded that she "wasn't going anywhere." The victim told him that she would walk home, and started getting out of the car. The defendant told her that he did not want to get blood in his car. The victim, who had exited the car, was confused by his statement until she saw that he was holding a gun and pointing it at her head. The defendant had also exited the car and was two or three feet away from the victim, and he stated that she was going to have sex with him again or get shot, and that she was not going to leave unless she had sex with him. He ordered her to get back in the car. The victim testified she was not afraid of the gun because she did not believe he would really shoot her. However, she indicated that she did not feel that she could leave and that she "had doubt about whether I was going to leave … [b]ecause he had the gun." She told him she intended to leave, and after a minute or two, when she still refused to return to the car, the defendant shot her in the forehead. The victim testified that she believed the defendant fired the gun a second time. She ran from the scene, not realizing that she had been shot until she saw the blood. The victim knocked on the doors of three or four nearby houses and got no response. The defendant then drove up to her in his car and asked if she

_____

[1]The victim testified that the events occurred on the "night of" August 16, 2011, but her subsequent testimony, as well as that of other witnesses, established that the events transpired substantially during the early morning hours of August 16th.

[2]The victim initially testified that the car was parked out in the county just near trees, but after refreshing her memory twice with her statement to police, recalled the church and sign.

needed a ride. She ran to an apartment complex and knocked on several doors, and a woman eventually let her use a telephone to call 911. An ambulance came to take her to the hospital. The victim also spoke to police at the apartment complex.

The victim was treated at the hospital and told police that A.J., a tall, dark-skinned man with a scar on his arm, had shot her. She was shown a photographic lineup and picked out the defendant's picture. The hospital took a swab from her mouth and some clothing. The victim did not remember what time of night the events transpired. The victim testified that she had been anxious and unable to sleep since the shooting and that she had begun taking medication for anxiety.

On cross-examination, the victim denied that she was working as a prostitute at the time. She did not recall if, during the time she was riding with the defendant, they parked at the Lincoln Courts apartment complex. She agreed that the defendant, after he shot her, asked her if she wanted a ride to the hospital. She testified that she went to Regional Hospital and not Jackson General but also testified that she was heavily medicated in the ambulance. The victim testified at first that the defendant did not grab her when she was exiting the car. She later testified that he did hold onto her hand and grabbed her hair as she was getting out and that she denied it "because I don't want to throw up all over myself."[3] She testified he held her hand for a short period of time – not for ten minutes. When confronted with her statement to police that he grabbed her wrist for ten minutes, she testified that it was not a "brief grab" and that it did not hurt. She elaborated that "it's like being trapped and not being able to move."

On redirect examination, she testified that the defendant grabbed her in the car and that he held her for more than five minutes. She clarified that she and the defendant may have been three or four feet apart when he shot her and that the gun was two to three feet from her head.

On re-cross-examination, she testified that she did not recall if she left her glasses in the defendant's car and did not recall telling police that she had. She agreed that she had told investigators that the defendant began acting crazy and aggressive after they had intercourse.

Teresa Volner testified that she lived near the Grace Baptist Church in Madison County and that her mother woke her up sometime in the middle of the night on August 16, 2011, because someone was banging on the door. Ms. Volner could not see anyone by the time she got to the door but saw a woman out of a side window walking to the house next

---

[3]The court held a brief recess during the victim's cross-examination because defense counsel and the judge were both afraid from her demeanor that she would "get sick."

door. The woman then ran to the highway in front of Ms. Volner's house and began gesticulating as though in distress. Ms. Volner stood in the yard, and saw a large beige or gold car "fly by and stop where she was. She was running real fast down the road." The car put on the brakes and the woman "sort of like leaned in the window," and then she disappeared; Ms. Volner speculated that the woman had jumped into the ditch. Ms. Volner called 911 both from inside the house and in the yard to report that a woman was in distress. She then shouted at the woman to ask her if she needed help when she saw the woman at the neighboring house on her other side, but the woman disappeared. Ms. Volner testified that she was not there to witness anyone help the woman or allow her to use the telephone and that she could not identify the woman.

Deputy Andrew Pickens testified that on August 16, 2011, he was dispatched to respond to the 911 call from Ms. Volner around 2:30 a.m. Ms. Volner reported that a black woman with a short haircut and large bag needed help. Deputy Pickens took the report, and then another officer, who was taking the report on the assault, asked him to search the area around the church for bullet casings. He was unable to locate any.

Lieutenant Felicia Stacy testified that she took the victim's statement at the Madison County General Hospital, where she was dispatched between 3:00 and 3:30 a.m. The victim had blood "all down the front of her face" and was still being treated for her wound. The victim told Lieutenant Stacy that "A.J." had shot her, and she picked the defendant out of a photographic lineup. Lieutenant Stacy testified that she then collected the victim's underwear and took a DNA sample from the victim.

Lieutenant Stacy testified that the defendant was arrested at his residence around noon. She conducted a gunshot residue test on the defendant's hands and took a DNA sample from him. The defendant denied knowing the victim and denied that he was with anyone the previous night. He claimed that he had driven around, went to his mother's home in Bolivar, sat drinking in her driveway, and then left to drive around Jackson without having made contact with her.

Sergeant T.J. King of the Madison County Sheriff's Office also participated in interviewing the victim and defendant. He attempted to locate the defendant after leaving the hospital, and he then went to the crime scene to search it during daylight. He found tire tracks in the area, which he testified was a common place for sexual activity. He then took the defendant into custody around 11:00 a.m. The defendant gave consent for a search of his vehicle, a champagne-colored Malibu. The car was recovered from the residence where the defendant was arrested, not in the driveway or on the street, but parked in the yard directly behind the house. Sergeant King confirmed Lieutenant Stacy's testimony regarding the evidence collection and the defendant's statements during his interview with police.

-4-

Sergeant King testified that the defendant had told them he was driving around from 5:00 or 6:00 p.m. the day before until 4:00 a.m. on August 16th. He returned home at 4:00 a.m. and had sex with his girlfriend. On cross-examination, Sergeant King testified that he did not find a gun or eyeglasses inside the car.

Sergeant King clarified that Jackson Police Department had initially responded to the victim's call to 911, as the crime had occurred close to the city limits, and the apartment she called from was within the city limits. After Jackson police accompanied the victim to the hospital, it was determined that the victim was the same woman seen by Ms. Volner, and the Sheriff's Department took over investigations.

Russell Davis, a special agent and forensic scientist for the Tennessee Bureau of Investigation, testified that elements indicative of gunshot residue were absent on the samples collected from the defendant's hands. Mr. Davis testified that gunshot residue would be present on surfaces within arm's length of a fired weapon. However, the residue would disappear with the passage of time; he testified that after eight hours, the residue would no longer be present. The residue would also disappear if washed off in the course of normal hand washing. Accordingly, he testified that the results did not eliminate the possibility that the defendant fired a gun, or handled, or was near a weapon as it fired.

Lawrence James, also a forensic scientist at the Tennessee Bureau of Investigation, testified that he found semen in the victim's underwear and that the DNA profile of the semen matched that of the defendant. He did not find any DNA on the removed backseat of the defendant's vehicle.

Pacine Long testified for the defense. Ms. Long stated that she was the defendant's "on and off" girlfriend. On August 16, 2011, the defendant drove a champagne-colored Malibu, which he habitually parked either in the back yard or the side yard of the house. On cross-examination, Ms. Long testified that the defendant left her home at 5:30 or 6:00 p.m. on August 15, 2011, and came home at 4:00 a.m. on August 16th. They had sex, and he then took her to work at 6:00 a.m.

The jury acquitted the defendant of attempted first degree (premeditated) murder but found him guilty of the lesser-included offense of attempted voluntary manslaughter. The defendant was convicted of aggravated assault and especially aggravated kidnapping as charged in the other counts. The trial court then merged the attempted voluntary manslaughter conviction into the aggravated assault conviction. The defendant filed a motion for a new trial or motion for acquittal challenging the sufficiency of the evidence, and the trial court denied the motion.

# ANALYSIS

## I. Sufficiency of the Evidence

The sole issue presented for review is a challenge to the sufficiency of the evidence supporting the three convictions. When an appellate court reviews the sufficiency of the evidence, it must consider whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). If the evidence is insufficient to support a finding of guilt beyond a reasonable doubt, the conviction must be set aside. Tenn. R. App. 13(e). On review, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). The appellate court may not re-weigh the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000). The trier of fact resolves questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Accordingly, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Further, a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant bears the burden of demonstrating that the evidence is insufficient to support the verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## A. Especially Aggravated Kidnapping

The defendant contends that the victim's testimony that she was not afraid of the gun and that she did not think the defendant would shoot her requires overturning his conviction for especially aggravated kidnapping. He further asserts that the relatively short duration of the abduction constitutes insufficient evidence to support the conviction. Especially aggravated kidnapping, as charged here, is defined by Tennessee Code Annotated section 39-13-305 (2010):

> (a) Especially aggravated kidnapping is false imprisonment, as defined in § 39-13-302:
>
> (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon;

False imprisonment, in turn, occurs when a defendant "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a).

The Tennessee Supreme Court recently examined the elements of kidnapping in *State v. White*, 362 S.W.3d 559 (Tenn. 2012). As pertinent to the defendant's argument, the court noted that "none of our kidnapping provisions require proof of a specific distance or period of time." *Id.* at 576. Instead, it "is the purpose of the removal or confinement and not the distance or duration that supplies a necessary element of aggravated kidnapping." *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997) (holding that the statute in place at the time did not require removal for a particular time or distance or to a particular place) *overruled on other grounds by White*, 362 S.W.3d at 578. A substantial interference with the victim's liberty is sufficient, although a trivial restraint is inadequate. *White*, 362 S.W.3d at 576. Time and distance are both significant to the analysis of whether the confinement was substantial. *Id.* The court in *White* noted that the Model Penal Code requires a removal from the victim's residence or business or a substantial distance from the site of the kidnapping or confinement for a substantial period in a place of isolation. *Id.* (citing Model Penal Code § 212.1). "Based on the chosen terminology, it appears that the General Assembly had in mind a removal or confinement that is similar to that which is contemplated by the Model Penal Code, although not as explicitly defined." *Id.*

Another key component of finding substantial interference is that the removal or confinement cannot be essentially incidental to an accompanying felony. *White*, 362 S.W.3d at 578. Prior to the decision in *White*, appellate courts conducted a due process analysis when a defendant was convicted of both a kidnapping offense and an accompanying felony. *See Dixon*, 957 S.W.2d at 533; *State v. Anthony*, 817 S.W.2d 299 (Tenn. 1991). *White*, however, overruled this line of analysis. *White*, 362 S.W.3d at 578. Under *White*, the question of whether the evidence established beyond a reasonable doubt that the confinement exceeded that necessary to accomplish the accompanying felony is a question for the jury, and it is the duty of the trial court to give proper instructions in that factual inquiry. *Id.* at 577-78.

> When jurors are called upon to determine whether the State has proven beyond a reasonable doubt the elements of kidnapping, aggravated kidnapping, or especially aggravated kidnapping, trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction.

*Id.* at 578. Appellate courts may then examine the sufficiency of the evidence, including whether the evidence supports a conclusion that the kidnapping is not incidental to the felony but is independently significant. *Id.*

Factors to examine in determining whether there was substantial interference with the victim's liberty include: (1) the nature and duration of the victim's removal or confinement by the defendant; (2) whether the removal or confinement occurred during the commission of the separate offense; (3) whether the interference with the victim's liberty was inherent in the nature of the separate offense; (4) whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so; (5) whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and (6) whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense. *Id.* at 580-81.

Accordingly, under *White*, in a case where the defendant is convicted both of a kidnapping offense and of an accompanying felony, an appellate court reviewing the sufficiency of the evidence must determine whether any rational trier of fact could have found beyond a reasonable doubt that the confinement of the kidnapping offense was not incidental to the accompanying felony but was significant enough in itself to support a conviction.[4]

In this case, after the victim expressed a desire to leave, the defendant detained her in the vehicle by grabbing her hand and hair. The victim eventually pulled away and exited the vehicle. The defendant then confronted her with his gun and told her that she would have sex with him again or he would shoot her. Although the victim testified that at first she did not really believe he would shoot, she also indicated that she did not feel free to leave. She testified at one point that "it's like being trapped and not being able to move." The victim

---

[4]If, however, the jury was improperly instructed, the appellate court must conduct harmless error analysis because "[o]nly when the jury is properly instructed can appellate review of the sufficiency of the convicting evidence satisfy the due process safeguard." *State v. Cecil*, 409 S.W.3d 599, 609 (Tenn. 2013). This requires the appellate court to determine whether a failure to instruct the jury was harmless beyond a reasonable doubt, that is, "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (citation omitted). This case, however, calls for a mere review of the sufficiency of the evidence. The defendant's trial took place some months after the Tennessee Supreme Court's decision in *White*, and the defendant did not raise any issue regarding jury instructions, nor were the jury instructions included in the record on appeal. Accordingly, we presume the jury was correctly instructed. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988); *see also* Tenn. R. App. P. 24(b).

"had doubt about whether [she] was going to leave ... [b]ecause he had the gun." She and the defendant faced each other a few feet apart outside the vehicle while he pointed a gun at her head. The entire period of detention was between five and ten minutes and ended when the victim, having declared that she was leaving, refused to get back in the car and the defendant shot her in the head.

The aggravated assault in this case was accomplished when the defendant shot the victim in the head. We conclude that a rational trier of fact could have found that the especially aggravated kidnapping was not incidental to the aggravated assault. The evidence at trial suggests that the defendant only shot the victim when it became clear that she would escape; there was no evidence that the detention of the victim was effected in order to accomplish the aggravated assault. The kidnapping was not incidental to the assault; instead, assault occurred as the victim attempted to escape the kidnapping.

We further conclude that, although the detention was of short duration and although the victim was not moved as part of the kidnapping, the evidence is nevertheless sufficient to sustain the conviction. The kidnapping statutes do not require proof of a particular distance or time of detention. *White*, 362 S.W.3d at 576. Here, the defendant drove the victim to a secluded area where she would be unable to summon help and where he was unlikely to be detected, refused to let her leave, told her she "wasn't going anywhere," and that he would shoot her if she did not have sex with him again. The defendant attempted to move the victim into his car at gunpoint, but she refused to go. The detention lasted between five and ten minutes. The evidence in this case supports the jury's finding that the defendant's actions substantially interfered with the victim's liberty. *See State v. Turner*, 41 S.W.3d 663, 670 (Tenn. Crim. App. 2000) (upholding conviction for especially aggravated kidnapping where victim was detained for a "relatively brief" time while driving a "relatively short" distance – approximately the time required for one defendant to point the gun at her leg and then her head and debate shooting her before she jumped from the car to safety); *State v. Shelby*, No. M2006-02582-CCA-R3-CD, 2011 WL 795834, at *2, 4 (Tenn. Crim. App. Mar. 8, 2011) (upholding especially aggravated kidnapping conviction where the victim was detained and fought the defendant in her home for eight to ten minutes before escaping and where the accompanying felony was burglary); *see also State v. Osby*, No. W2012-00408-CCA-R3-CD, 2012 WL 5381371, at *1-2, 9 (Tenn. Crim. App. Nov. 2, 2012) (upholding especially aggravated kidnapping conviction where the victims, after being bound and then robbed, were held in the back yard while one assailant attempted to enter the house, was frightened by a dog, and then took one victim's clothing but where the victims were able to escape from the poor-quality duct tape as soon as the assailants left the yard). We conclude that the evidence was sufficient to sustain the defendant's conviction for especially aggravated kidnapping.

## B. Aggravated Assault

The defendant next contends that his conviction for aggravated assault should also be overturned. As charged here, aggravated assault is committed when the defendant intentionally or knowingly causes bodily injury to another, and the assault involved the use of a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(iii); T.C.A. § 39-13-101(a)(1).

The defendant does not argue that there was no proof regarding the elements of this offense. Instead, he contends that the victim lost all credibility by denying she was a prostitute and by testifying that she was shot from two or three feet away despite the fact that the bullet did not apparently penetrate her brain. This is a classic credibility determination which falls to the province of the jury. The victim testified that, after threatening to shoot her if she refused to have sex again, the defendant did in fact shoot her in the head from two to three feet away. The prosecution introduced evidence documenting the gunshot wound. The jury credited the victim's testimony. The jury chose not to believe the defendant's version of events: that he had no idea who the victim was and had not been with her the previous night, despite DNA evidence to the contrary, the victim's testimony, and witness testimony regarding his vehicle. The evidence is sufficient to allow a rational trier of fact to conclude that the defendant knowingly or intentionally caused the victim bodily injury with a deadly weapon.

### C. Attempted Voluntary Manslaughter

### 1. Sufficiency

The defendant's argument that the elements of attempted voluntary manslaughter have not been satisfied is likewise an attack on the credibility of the victim. The State simply omits this issue from its brief. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). The existence of adequate provocation is a question of fact for the jury to determine. *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). A person commits attempt when, acting with the culpability otherwise required for the offense, he:

> 1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

-10-

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a).

In this case, no evidence was introduced that adequate provocation existed. Previously in Tennessee, a conviction for the lesser-included offense of manslaughter in the absence of proof of passion did not require reversal "if the evidence demands a conviction of a higher degree of homicide than that found by the verdict, and there is either no evidence in support of acquittal of the greater crime, or if there is, the verdict of the jury clearly indicates that the evidence in support of acquittal was disbelieved." *State v. Mellons*, 557 S.W.2d 497, 499 (Tenn. 1977) *overruled by State v. Parker*, 350 S.W.3d 883, 909 (Tenn. 2011). The *Mellons* court noted that such a defendant suffered no prejudice. *Id.* at 499-500 (concluding, however, that defendant Mellons suffered prejudice because there was evidence the jury would have acquitted him of the greater crime and convicted him of involuntary manslaughter absent the instruction on voluntary manslaughter).

In *State v. Parker*, however, the Tennessee Supreme Court overruled *Mellons* and concluded that "[t]o sustain a conviction of a lesser-included offense, the proof must be sufficient to support each and every element of the conviction offense." *Parker*, 350 S.W.3d at 909. A reviewing court must examine each element of the offense of which the defendant stands convicted and determine if each element is supported by sufficient evidence. *Id.* "If the proof does not adequately support each and every element, the defendant is entitled to a reversal of the conviction." *Id.* This is true even if the evidence is sufficient to support a conviction for the greater offense. *Id.*; *see also State v. Brown*, 836 S.W.2d 530, 553-54 (Tenn. 1992) (holding that trial court did not err in refusing to instruct the jury on voluntary manslaughter because it was essentially a legal impossibility for a small child's conduct to be adequate provocation).

The record demonstrates there is proof sufficient to convict the defendant of a greater degree of attempted homicide but a complete absence of evidence regarding any provocation, adequate or otherwise, for the defendant's attempt to kill the victim. Accordingly, attempted voluntary manslaughter should not have been charged as a lesser-included offense of attempted first degree murder. No rational trier of fact could have found that the victim's action in telling the defendant that she would not have sex with him and that she was going to leave constituted "adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a); *see State v. Elder*, 982 S.W.2d 871, 878-79

-11-

(Tenn. Crim. App. 1998) (concluding that a rational trier of fact could not have found provocation or passion for a killing committed four and one-half hours after an argument regarding the victim selling drugs in the defendant's territory). Under *Parker*, this conviction cannot stand, and the trial court erred in not granting the defendant's motion for acquittal on this conviction.

## 2. Merger

Although the trial court committed error denying the defendant's motion for acquittal of the conviction for attempted voluntary manslaughter in the absence of evidence of provocation, this conviction was merged into the aggravated assault conviction. The merger doctrine is a rule of statutory construction and not a principle of constitutional law. *State v. Godsey*, 60 S.W.3d 759, 774 (Tenn. 2001). When a defendant is convicted of two offenses and one is a lesser-included offense of the other, "Tennessee merger law … mandates that dual convictions of both a greater offense and its lesser-included offense merge, thereby vacating the conviction for the lesser-included offense." *State v. Ducker*, 27 S.W.3d 889, 893 (Tenn. 2000) (citing *State v. Beard*, 818 S.W.2d 376, 379 (Tenn. Crim. App. 1991)).

Merger also applies in the circumstance in which two guilty verdicts are returned to alternative charges. When the defendant is convicted under two alternative theories for the same offense, "the greater charge stands and the guilty verdict on the lesser charge merges into the greater charge." *State v. Banes*, 874 S.W.2d 73, 81 (Tenn. Crim. App. 1993) *overruled on other grounds by State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998) *as recognized by State v. Upshaw*, No. W1999-00777-CCA-R3-CD, 2001 WL 29456, at *8 n.1 (Tenn. Crim. App. Jan. 11, 2001).

When the defendant is convicted under alternate theories, the second conviction is not set aside as mere surplusage. *State v. Addison*, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). If the conviction offenses show the same offense committed by different means and there is no legal bar to verdicts on both charges, "there is no need to 'dismiss,' 'vacate,' or 'strike,' a particular 'conviction' if what is meant by the term 'conviction' is the return of the jury verdict of guilt." *Id.* Instead, the verdict remains "a legitimate finding of fact and law which the trial court should preserve by merging the same offense counts into one judgment of conviction." *Id.* A merger following a separate jury verdict on each count helps to avoid double jeopardy issues related to retrying a defendant if a conviction is reversed, gives the State "a basis to protect other convictions to which it may be entitled," and preserves the use of potential aggravators. *State v. Howard*, 30 S.W.3d 271, 275 n.4 (Tenn. 2000). Accordingly, although one conviction may be merged with another for a single judgment of conviction, the merged offense is not extinguished. *State v. Soller*, No. E2008-02420-CCA-R3-CD, 2010 WL 2301748, at *13 (Tenn. Crim. App. June 9, 2010); *State v. Seals*, No.

E2007-02332-CCA-R3-CD, 2009 WL 55914, at *8 (Tenn. Crim. App. Jan. 9, 2009).

Insofar as the defendant's conviction for attempted voluntary manslaughter has not been extinguished, it cannot stand. This court has previously applied harmless error analysis when analyzing the validity of a merged conviction. *State v. Williams*, No. W2009-01638-CCA-R3-CD, 2011 WL 1770655, at *10 (Tenn. Crim. App. May 9, 2011) (concluding that the indictment was invalid and precluded a lawful conviction for felony murder but that the error was harmless because the felony murder conviction merged into a first degree murder conviction); *State v. Chambers*, No. M2001-02674-CCA-R3-CD, 2003 WL 1913871, at *9 (Tenn. Crim. App. Apr. 22, 2003) (declining to examine trial court's denial of motion for acquittal on the basis that, even if the trial court erred in not granting acquittal on felony murder count, the error was harmless because the count merged with the first degree murder conviction). However, we conclude that the better course of action in this case is to remand to the trial court for a new judgment form which reflects that the defendant's conviction for attempted voluntary manslaughter is reversed and no longer merges with the aggravated assault conviction.

## CONCLUSION

Based on the foregoing, we affirm the defendant's convictions for especially aggravated kidnapping and aggravated assault; reverse the conviction for attempted voluntary manslaughter; and remand for further proceedings consistent with this opinion.

_____
JOHN EVERETT WILLIAMS, JUDGE

-13-