IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 21, 2015 Session

## STATE OF TENNESSEE v. MICHAEL LAMBDIN

**Appeal from the Criminal Court for Knox County**
**No. 93721B       Steven W. Sword, Judge**

---

**No. E2014-00547-CCA-R3-CD – Filed April 27, 2015**

---

The Defendant, Michael Lambdin, appeals as of right his conviction for first degree murder committed during the perpetration of an attempted robbery. In this appeal, the sole issue presented for our review is whether the evidence is sufficient to support his conviction for felony murder. Specifically, the Defendant contends that the State failed to prove felony murder because the evidence was insufficient to support the elements of the underlying felony and because he abandoned his intent to commit the underlying felony prior to the shooting and killing of the victim by his co-defendant. After reviewing the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Bruce E. Poston (at trial), Knoxville, Tennessee, and Troy L. Bowlin, II (at motion for new trial hearing and on appeal), Morristown, Tennessee, for the Appellant, Michael Lambdin.

Herbert H. Slatery, III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Charme Allen, District Attorney General; and Leslie R. Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION
FACTUAL BACKGROUND

This case arises from the Defendant's participation in the attempted robbery and shooting death of Vincent Presutto ("the victim") at his Knoxville apartment on

December 17, 2009. Thereafter, the Defendant, along with Frederick Keith and Anthony White, were indicted for the felony murder of the victim. See Tenn. Code Ann. § 39-13-202(a)(2).

The following proof, in the light most favorable to the State, was adduced at the joint trial of the Defendant and Keith ("the co-defendant").[1] The victim was a small-time dealer of opiates, doing so in order to finance his addiction to the substance, and the Defendant often purchased pills from the victim. On December 17, 2009, the victim filed a prescription for pain medication and spoke with the Defendant about his supply. The two met up at a local grocery store, and the Defendant purchased one of these pills from the victim.

Later that day, White and the co-defendant were at the home of Natalie Freeman, White's girlfriend, drinking liquor when the Defendant called and said he "wanted to hang out[.]" White and the co-defendant drove to meet the Defendant, and after the Defendant got into the car with them, the group returned to Freeman's home. While en route, the Defendant and the co-defendant discussed robbing the victim of his large quantity of pills. According to White, the Defendant described the victim as "[a] pushover" and someone who could "easily [be] taken advantage of[.]"

The conversation about robbery continued once inside Freeman's home, and the group continued to drink alcohol. According to Freeman, the Defendant was angry at the victim "because [he] kept upping the price for pills," so the Defendant wanted to rob the victim. The Defendant wanted White "to drive and . . . needed [the co-defendant] to be his muscle." The Defendant's plan was for him to get the victim to answer the door, so he could go inside the apartment, and then the co-defendant, armed, was going to "rush in after that" and appear to be robbing both the victim and the Defendant and take the victim's pills. The Defendant was supposed to return to the truck. That way, the victim would not know that the Defendant, a frequent buyer, was involved in the robbery. White was to receive some small remuneration for his driving services.

Freeman observed the Defendant pull from his pocket a silver revolver with "a six-shooter type spin on it" while he was inside her home. Prior to leaving the residence, the Defendant phoned the victim and set up the meeting. White saw the co-defendant in possession of this weapon as the three men exited the home around 11:00 p.m. At that time, the Defendant was wearing blue jeans, a t-shirt, "a camouflage type jacket that zipped up," and a camouflage ball cap. The co-defendant was wearing blue jeans, a t-shirt, a colorful hoodie, and a blue and red toboggan.

---

[1] Prior to trial, White had entered into a plea agreement in exchange for his truthful testimony at trial against the Defendant and Keith.

They left in White's truck and proceeded to the victim's residence, directed to that location by the Defendant. Once there, White stayed in the vehicle while the Defendant and co-defendant went to the apartment. An SUV arrived in the parking lot, so White "backed up" his truck into another parking spot. The Defendant returned to the truck first and almost got hit by the SUV; according to White, the Defendant appeared "[s]kittish, scared" upon his return. The driver of that SUV was later able to identify the Defendant from a photographic lineup. A few more minutes passed, and the co-defendant "jumped in the truck and said, 'Go fat man. Go.'" According to White, the co-defendant was "furious" when he returned to the truck, punching the dashboard and saying that the victim fought back and that the gun "went off[.]" The Defendant said to the co-defendant, "Don't kill me." White did not see the gun on either of the men at this time.

After hearing gunshots and the victim's cries for help, neighbors arrived on the scene, and 911 was called. The police came and processed the crime scene. Both the hats worn by the Defendant and the co-defendant were discovered at the scene—the camouflage hat "just inside the door in the blood" and the blue and red toboggan on a ledge outside the apartment. The Defendant's Smith & Wesson six-shot revolver was found lying in the doorway. Although empty pill bottles were observed, no pills were found inside the residence. The bullet that killed the victim was fired in a slightly downward trajectory just outside the door, piercing the doorframe and striking the victim near the collar bone. It appeared that the victim was in a crouched position when he was hit, possibly indicating that he was trying to close the door and force someone out of the apartment. Phone records indicated that the victim and the Defendant had been in contact throughout the day and that the victim used his cellular telephone to call 911 at 11:18 p.m.

The autopsy revealed that the victim had been pistol-whipped in the head with the gun, likely occurring after the victim was shot. It was also discovered from observation of his hands that the victim had, at some point, grabbed ahold of the gun, indicating that a struggle took place. The victim's blood tested positive for therapeutic levels of methadone and relatively high levels of oxycodone and also recent use of marijuana and cocaine.

When the three men returned to Freeman's residence after the shooting, neither the Defendant nor the co-defendant were wearing their hats according to Freeman. Also, she testified that none of the men had the revolver in their possession upon their return. Freeman described the co-defendant as "out of sorts[,]" meaning, "in shock, very, very white." The co-defendant relayed the following details of the robbery to Freeman:

> That when they got over there to [the victim's] house, [the Defendant], had went inside, and he came back outside of the house, and he

was running away from the house, and that the gun was on the ground, and [the victim] had picked the gun up, and so [the co-defendant] and [the victim] were fighting over the gun, and they were very, very close to each other, struggling over the gun and it had went off, and [the victim] got shot.

She also described the Defendant as hysterical, crying, and yelling about losing his gun, which was a family heirloom. The Defendant was also upset about losing his hat according to White. According to White, the co-defendant was mad at the Defendant for running away and not helping with the robbery. The men relayed to White that "they didn't get nothing" from the victim.

Knowing that the police were looking for White's truck, White and Freeman hid it behind St. Mary's Hospital. Both White and the Defendant stayed the night at Freeman's home, but the co-defendant left sometime in the middle of the evening, later fleeing the state.

The Defendant testified in his own defense at trial, claiming that he made a "horrible mistake" and that his co-defendant was the one who orchestrated the attempted robbery. According to the Defendant, the co-defendant asked him for his gun and told him no one would get hurt. The Defendant stated that, once at the victim's apartment, he went inside the apartment alone at first because the victim closed the door behind him before the co-defendant had a chance to enter. In a ruse to get the victim to open the door again, the Defendant told the victim that he had left his wallet in the truck and would return with the money. However, the victim then offered to let the Defendant purchase the pills on credit. According to the Defendant, he insisted he go get his wallet from the truck and left the residence. The Defendant claimed at trial that he decided to abandon the robbery at this point because the victim had been "nice" to him, but the co-defendant insisted on completing the robbery. According to the Defendant, the co-defendant took his hat so the victim would open the door, thinking it was the Defendant. As the Defendant returned to the truck, he heard a gunshot. The Defendant admitted that this was the first time that he had told this version of the events.

The jury convicted the Defendant as charged in the indictment, and he was sentenced to life imprisonment for the felony murder conviction. This timely appeal followed.

## ANALYSIS

The Defendant challenges the sufficiency of the evidence supporting his conviction for felony murder. His argument is two-fold: (1) the evidence is insufficient to support the elements of the underlying felony of attempted robbery; and (2) the State

failed to prove that the killing was in furtherance of the attempt to perpetrate a robbery because he abandoned his intent to commit a robbery prior to the shooting. The State contends that the evidence sufficiently supports a conviction of felony murder because the jury heard and rejected the Defendant's claim of abandonment.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

In order to sustain a conviction of first degree felony murder as charged in this case, the State was required to prove "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts[.]" Tenn. Code Ann. § 39-13-202(b). Robbery is an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the

circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

In other words, "[a]lthough intent to kill is not required under the felony murder statute, the perpetrator must possess the requisite intent to commit the underlying felony for a felony murder conviction to be sustained." State v. John Dennis Rushing, No. 01C01-9501-CR-00020, 1996 WL 63920, at *6 (Tenn. Crim. App. Feb. 13, 1996). The felony murder rule applies when the killing is "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). "The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Id. (quotation omitted). The killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). If the underlying felony and killing were part of a continuous transaction with no break in the chain of events and if, in the case of flight, the felon had not reached a place of temporary safety between the events, felony murder is sufficiently established. State v. Pierce, 23 S.W.3d 289, 294-97 (Tenn. 2000).

Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108 (citing State v. Addison, 973 S.W.2d 260, 266 (Tenn. Crim. App. 1997); State v. Johnson, 661 S.W.2d 854, 861 (Tenn. 1983); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The Defendant submits that "the State failed to present evidence to support the elements of a prima facie case of robbery" and that, therefore, reversal of the felony murder conviction and dismissal of the charge are warranted. His argument in this regard is that "the evidence was undisputed that [he] decided not to follow through with the planned robbery and walked away from the scene of the eventual crime." We note two fatal flaws in the Defendant's argument: (1) he was charged with a killing committed during the perpetration of an attempted robbery; and (2) the proof was far from undisputed that he decided to renounce the robbery plan concocted by him and his co-defendant.

The State presented sufficient evidence that the Defendant and the co-defendant attempted to rob the victim of his prescription medication by violence and putting the victim in fear. The evidence was indeed undisputed that the Defendant, along with the

co-defendant and White, devised a plan to rob the victim of his prescription pain pills. There was testimony that the Defendant was angry with the victim for increasing the price of the pills and that he wanted to use the co-defendant as the "muscle" to dispossess the victim of his pills. The Defendant was the only person who knew the victim had a large quantity of pills in his possession that day, and it was the Defendant who arranged the meeting at the victim's apartment. The Defendant described the victim as a "pushover" to the other two men. They contrived a plan to get the victim to open his apartment door, and then the co-defendant would force his way into the apartment behind the Defendant. It was the Defendant's revolver, which he provided to the co-defendant, that was used as a display of force against the victim and found inside the victim's home. Once they arrived at the apartment complex, the Defendant and the co-defendant proceeded to the door of the victim's residence. The Defendant was then seen leaving the apartment and was shortly followed by the co-defendant. Moreover, no pills were ever found inside the residence. There was sufficient evidence for a reasonable juror to conclude that the Defendant's conduct constituted a substantial step toward the commission of the robbery.

The Defendant makes a brief statement that because he "was not charged or convicted of the underlying felony," his felony murder conviction should be reversed. The felony murder statute does not require that a defendant who is charged with first degree felony murder also be charged in a separate count of the indictment with the attempt or perpetration of the underlying felony, and "this court has observed 'that a felony murder indictment must allege that the killing was committed during the perpetration of a felony, but specific allegations of the elements and facts of the underlying felony are unnecessary.'" Charles Dewayne Moore v. State, No. E2006-02261-CCA-R3-PC, 2007 WL 1890652, at *5 (Tenn. Crim. App. July 2, 2007) (quoting State v. Alfonzo E. Anderson, No. W2000-00737-CCA-R3-CO, 2002 WL 1558491, at *2 (Tenn. Crim. App. Jan. 9, 2002)). Moreover, this court has upheld convictions for felony murder when defendants were acquitted by the jury of the underlying felony of especially aggravated robbery. See, e.g., State v. Michael Shane Grogger, No. M2008-02015-CCA-R3-CD, 2009 WL 3832921, at *14 (Tenn. Crim. App. Nov. 17, 2009); State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433 (Tenn. Crim. App. Dec. 3, 1997).

The Defendant also contends that he abandoned his intent to commit the underlying felony of attempted robbery prior to the shooting and killing of the victim by the co-defendant; therefore, his felony murder conviction cannot stand. He asserts that "the most serious charge of which a jury could have convicted [him] was facilitation of felony murder."[2] We respectfully disagree. Our review of the evidence presented at trial

---

[2] "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2),

shows that the Defendant phoned the co-defendant and "wanted to hang out[.]"  The Defendant had purchased one pill from the victim earlier that day.  Once assembled, the Defendant, along with the co-defendant and White, decided to rob the victim of his remaining large quantity of prescription pain medication.  Shortly after this decision, they proceeded to the victim's apartment, directed there by the Defendant.  In accordance with their plan, the Defendant and the co-defendant went to the residence while White remained behind to drive the getaway vehicle.  Once the victim opened the door, he apparently fought back and tried to force the door closed.  The victim was then shot and pistol-whipped in the head with the Defendant's gun, and he later died from the gunshot wound.  Both hats, one belonging to the Defendant and one belonging to the co-defendant, were found at the scene.

The proof sufficiently established that the underlying felony of attempted robbery and the killing were part of a continuous transaction with no break in the chain of events or, stated another way, that the killing was committed in pursuance of the attempted robbery and not collateral to it.  Clearly the robbery did not go as planned because the victim attempted to fight back and was not a "pushover" as described by the Defendant.  However, the jury, as was their prerogative, did not find the Defendant's assertion credible that he decided to abandon the robbery prior to the shooting.  Moreover, any decision to abandon the robbery occurred almost simultaneously with the shooting of the victim, and the Defendant had not reached a place of temporary safety.  See Pierce, 23 S.W.3d at 295.  By his own admission, the Defendant made no attempt to thwart the robbery in any way and failed to summon the police for help following the shooting; he simply returned to the truck driven by White and waiting nearby.  Additionally, the trial court declined to give an instruction on renunciation because the proof did not support such an affirmative defense.[3]

This case illustrates a classic example of the application of the felony murder rule.  See, e.g., State v. Demariceo Chalmers, No. W2011-01274-CCA-R3-CD, 2012 WL 3601626, at *10-11 (Tenn. Crim. App. Aug. 22, 2012) (rejecting defendant's claim that he abandoned his intent to rob the victim prior to shooting and killing the victim) (citing Smith v. State, 354 S.W.2d 450, 452 (1961) (stating that "the person who kills another while engaged in committing a felony cannot escape conviction from murder in the first degree, by showing that his intent was not to kill, but to defend his own life or person, or to escape arrest, or to avoid pursuit or death"); People v. Mills, 624 N.E.2d 384, 389-390

<hr>

the person knowingly furnishes substantial assistance in the commission of the felony."  Tenn. Code Ann. § 39-11-403(a).

[3] See Tenn. Code Ann. § 39-12-104 (Renunciation "is an affirmative defense to a charge of criminal attempt . . . [where the defendant], after committing the criminal attempt . . . prevented the successful commission of the offense attempted . . . under circumstances manifesting a complete and voluntary renunciation of the [defendant's] criminal purpose.").

(Ill. App. Ct. 1993) (noting that "[c]hief among the inherent dangers of armed robbery is the danger arising from resistance by the victim . . . [i]t would defeat the purposes of the felony-murder doctrine if such resistance—an inherent danger of the forcible felony—could be considered a sufficient intervening circumstance to terminate the underlying felony or attempted felony")), perm. app. denied (Tenn. Jan. 14, 2013). Based on the evidence, we conclude that a reasonable juror could have found beyond a reasonable doubt that there was a connection in time, place, and continuity of action between the shooting and the attempted robbery.

## CONCLUSION

In consideration of the foregoing, we conclude that the evidence is sufficient to support the Defendant's conviction for felony murder. The judgment of the Knox County Criminal Court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE